**Paul L. MASON, Plaintiff,**

v.

**Timothy John STOCK, and the City of Haysville, Kansas, a Municipal Corporation, Defendants.**

**Paul L. MASON, Plaintiff,**

v.

**Timothy John STOCK, Bruce K. Powers, Scott Holton and the City of Haysville, Kansas, a Municipal Corporation, Defendants.**

Civil Action Nos. 92–1539–MLB, 93–1437–MLB.

United States District Court, D. Kansas.

Jan. 30, 1997.

Jerry L. Berg, Law Offices of Jerry L. Berg, P.A., Wichita, KS, for Paul L. Mason.

Lisa Jane Lewis, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, Barbara Scott Girard, Hershberger, Patterson, Jones & Roth, Wichita, KS, Alan L. Rupe, Morrison & Hecker L.L.P., Wichita, KS, for Timothy John Stock, Bruce K. Powers, Scott Holton, City of Haysville.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendants' motion for summary judgment. (Doc. 190). Plaintiff responded, (Doc. 207), and defendants replied. (Doc. 209). Plaintiff also filed a supplemental brief. (Doc. 231).

## I. Introduction

These consolidated cases [1] involve a traffic stop which occurred on the night of November 7, 1991. Defendant Stock, a Haysville Police officer, arrested plaintiff for DUI. An altercation ensued between plaintiff and defendant Stock. Plaintiff was cited for DUI, resisting arrest and a minor lane violation. Shortly after the arrest, it was determined by blood test results that plaintiff had not been drinking. The DUI charge was quickly dismissed but in a subsequent municipal court trial, plaintiff was convicted of resisting arrest and the lane violation. He appealed to district court where a jury convicted on the lane violation but acquitted on the resisting arrest charge.

Plaintiff then filed the first of these consolidated cases. He alleged violations of 42 U.S.C. § 1983 against various Haysville Police officers (false arrest, excessive use of force, retaliation and malicious prosecution) and various "custom and practice" claims against the City of Haysville pertaining to the alleged lack of training and discipline of its officers. Plaintiff then filed the second case in which he essentially repeated the claims made in the first case and added state law claims.

It would be an understatement to say that these cases have proceeded on a long and troubled path. There have been rancorous discovery problems. It has been very difficult to define the issues and assemble a pretrial order.[2] The problems have been caused, in large part, by the conduct of plaintiff's lawyer, Jerry Berg, who clearly lacks the ability and objectivity to recognize, develop, analyze and present the factual and legal issues in a case of this type.

Mr. Berg represented the plaintiffs in another case against the City of Haysville and some of the same officers who are defendants in these cases: *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir.1995) (*Wilson I*) and 98 F.3d 1247 (10th Cir.1996) (*Wilson II*). Many of the claims made and discussed in *Wilson I and II* appear in one form or another in these cases. In *Wilson I*, Judge Porfilio made the following observations regarding Mr. Berg's conduct:

In their briefs on appeal, in their memoranda in opposition to summary judgment, and at oral argument, plaintiffs have repeatedly made assertions not borne out by the record. Asserting a "position of surrender" or "code of silence" does not create evidence where there is none. Numerous but unsupporting citations to the record notwithstanding, such creative phraseology borders on misrepresentations. Long, rambling, incoherent statements of immaterial facts similarly only serve to obfuscate the issues and delay the process of justice. As this reversal indicates, such tactics are not only improper but ultimately ineffective.

52 F.3d at 1558. These observations apply equally to Mr. Berg's conduct in these consolidated cases.

In their motion for summary judgment, the officers raised claims of qualified immunity. Plaintiff's response to the motion was precisely as described by Judge Porfilio. Faced with an inability to determine from plaintiff's response whether material factual disputes actually exist with respect to the qualified immunity issues, as well as some of

---

1. See this court's Memorandum and Order of November 30, 1994 1994 WL 682783. (Doc. 165).

2. The parties have submitted a lengthy pretrial order which will be filed, unsigned by the court, as a proposed pretrial order (Doc. 234). A final pretrial order reflecting the rulings herein will be filed later.

the other issues raised in defendants' motion, the court held an evidentiary hearing. Plaintiff, defendants Stock and Powers and several other witnesses testified. Based on the testimony, as well as the parties' written submissions, the court has been able to isolate a factual picture adequate for disposition of the pending motions. The court has not attempted to identify and discuss every factual dispute, for this would be impossible given Mr. Berg's disoriented approach to the case. Rather, the court has tried to identify only the material facts which will affect the outcome of the case under governing law. *Elam v. Williams,* 753 F.Supp. 1530, 1533 (D.Kan.1990), *aff'd,* 953 F.2d 1391 (10th Cir. 1992); *Nelson v. Holmes Freight Lines,* 37 F.3d 591, 594 (10th Cir.1994). While the court has opinions regarding the credibility of the witnesses who testified, it has decided the motions without assessing credibility or weighing evidence.

## II. *Material Facts* [3]

Tim Stock was a patrolman for the Haysville Police Department in 1991. On November 7, 1991, at approximately 11:25 p.m., he noticed Paul Mason's car travelling below the speed limit headed east on 71st Street, a four-lane road. Stock believed it was unusual to see a vehicle travelling that slow late at night on 71st, so he decided to follow Mason. (Doc. 191, Uncontroverted Fact at ¶ 2).

As he followed, Stock noticed Mason's car drift out of its lane and back, then stop at a stoplight straddling the white dotted lines separating 71st Street's two eastbound lanes. (Doc. 191, Uncontroverted Fact at ¶ 3). Stock decided to pull Mason over for failing to maintain a single lane of traffic. He also suspected Mason might be drunk, given the car's erratic course below the speed limit. After the light turned green and plaintiff cleared the intersection, Stock flashed his lights. Mason drove some distance past the intersection then stopped abruptly, causing Stock to nearly run into the back of Mason's car. (Doc. 191, Uncontroverted Fact at ¶ 6).

Stock approached Mason's driver side door and asked for his driver's license. The fol-

lowing conversation was recorded on Stock's belt tape recorder:

Stock: Hello. Driver's license please?

Mason: What are you stopping me for?

Stock: Sir, I need to see your driver's license, I'll be more than happy to explain to you why I pulled you over. Can you tell me why you slammed on your brakes to try to get me to run into the back of you?

Mason: I asked you a question. I said why did you stop me.

Stock: Sir, I....

Mason: I didn't break any laws or nothing.

Stock: Well, you failed to maintain a single lane of traffic. You also tried to cause an accident.

Mason: I was in the same, I was in the same lane approximately all the way.

Stock: Sir, I need to see your driver's license please.

Mason: Right there it is.

Stock: Would you take it out, please? Have you had anything to drink tonight, Mr. Mason?

Mason: Yeah.

Stock: Would you take a field sobriety evaluation?

Mason: Did I what?

Stock: I said would you take a field sobriety evaluation?

Mason: No, I wouldn't.

Stock: Would you exit your car, please?

Mason: Did I what?

Stock: I need you to step out of your car, sir. Step right back here.

Mason: (unintelligible)

Stock: Step right back here, sir.

Mason: I know you Haysville cops.

Stock: Place your hands on the side of the car, you're under arrest.

(Doc. 191, Uncontroverted Fact at ¶ 8).

Stock testified at the hearing that his decision to arrest Mason was based on Mason's erratic driving, Mason's answer that he did have something to drink, and Mason's refusal to take a field sobriety test. Stock thought

3. The facts are undisputed unless otherwise noted.

Mason's eyes looked watery and bloodshot and noted what he thought was the odor of alcohol.[4] Mason was also having difficulty answering the questions put to him, which in Stock's experience is one characteristic of intoxication.

According to Stock, after he asked Mason to put his hands on the car, Mason said "okay," but then refused to turn around and put his hands on the car and continued to face Stock with his fist clenched. Mason told Stock, "You got a gun? You want to shoot me now, just like the other guy down here? You get another cop out here, I didn't break no law."[5] At this point, Stock called for backup.

Stock testified that after calling for backup, he had to physically turn Mason around, grab his hands and cuff him because of Mason's rigid resistance. Although Mason never attacked Stock, Stock testified that when he told Mason to put his hands on the car so he could frisk him, Mason put his hands by his side and made them stiff and unyielding. When Stock attempted to handcuff Mason first and frisk him later because Mason would not put his hands on the car, Mason put his hands on the car so Stock could not reach them. Stock testified that he had to put Mason in the "wedge" between the open driver's side door and the door post to cuff him. During the arrest, Stock twisted his leg and pulled the tendons in his knee. He testified this happened when Mason pushed against him trying to avoid the handcuffs. Mason does not claim that any excessive force was used against him during this time.

As Stock's backup officer, Scott Holton, arrived, Stock walked Mason to the patrol car, one hand on Mason's belt and one hand on the handcuffs. At the patrol car, Stock told Mason to spread his feet so Stock could frisk him. Stock testified that Mason would not spread his feet so Stock had to push Mason's ankles apart using his own feet.

Mason's version of the arrest differed from Stock's in some respects. Mason testified that when Stock requested him to turn around and put his hands on the car, he immediately complied, turning himself around and giving Stock his hands, one at a time, to handcuff. He admits telling Stock to get a backup officer and asking Stock whether Stock was going to "shoot him like the other guy" but explained that he was apprehensive of Stock and wanted another officer present. Mason denied any struggle while being handcuffed next to his car, but testified that Stock pulled and yanked on the handcuffs on the walk to the patrol car, and that Stock beat him on his shoulders and back and kicked him in the legs before frisking him.

Stock and Holton's lieutenant, Bruce Powers, arrived at the scene. Mason complained that the handcuffs hurt and they were adjusted. Mason then claimed to have chest pains and one of the officers called an ambulance. While waiting for the ambulance, Stock asked Mason how much liquor he had consumed that night, and it was then that Mason informed Stock that he had not had any alcohol that night and had never had a drop of alcohol his entire life. Stock said, "That's not what you told me earlier," and Mason replied, "You asked me if I had a drink and I said yes I had. You didn't say what."

The ambulance arrived. Mason's blood pressure was high, so the ambulance took Mason to the hospital, with Stock and Holton following in Holton's patrol car. At the hospital, Holton stayed with Mason because he was still under arrest and because Stock was being treated for his twisted knee.

---

4. Mason strenuously disputes that he had red or watery eyes or the smell of alcohol on him. (Doc. 207 at 3–4).

5. Mason's statements, which are audible on Stock's belt tape recorder, refer to a prior incident in which Stock was involved. A man in Haysville pointed a gun at another police officer and dry fired it twice after being told to surrender his weapon. The other officer shot the man, and then radioed for Stock, who arrived on the scene moments later. Stock did not attempt to give the man first aid, and the man died. The plaintiffs in that case sued Stock claiming that his failure to give first aid was a violation of the man's constitutional rights, and Stock raised the issue of qualified immunity as a defense. The Tenth Circuit held as a matter of law that Stock's actions were reasonable. *See Wilson I.*

Stock testified that while waiting for x-rays of his knee, he wrote Mason two tickets, one for driving under the influence of alcohol and one for failure to maintain a single lane of traffic. He also had already decided to charge Mason with resisting arrest, but could not write a ticket for that at the hospital. A resisting arrest charge required a "long form" complaint sworn and notarized to by the arresting officer.

Meanwhile, Mason agreed to having his blood tested for alcohol content. For the test to be accurate, blood had to be drawn within two hours of the arrest. Usually, the police provide the hospital with a "blood kit" which is used to take the sample and remains the property of the police department. If the hospital uses its own materials to draw the blood, the police have to subpoena the hospital's records to get the results, which usually takes weeks.

Holton and Stock did not have a blood kit and their attempts to procure one failed. This prompted several telephone conversations between Powers, Stock and Holton about how to proceed with the DUI charge. They discussed whether to charge Mason for DUI based on probable cause alone, whether they needed to charge DUI at all in order to charge Mason with resisting arrest, or whether to ask the hospital to draw blood without a blood kit and subpoena the records later. (Plaintiff's Ex. 1, Telephone Transcripts 5, 9, 12, 13). They decided to charge Mason with the DUI based on probable cause, have the hospital draw the blood without the kit, and subpoena the test results later. (Plaintiff's Ex. 1, Telephone Transcript 12 at 3).

Powers picked up Stock at the hospital after Stock's knee was treated and drove him to the Haysville Police Department where the long form complaint for resisting arrest was being typed by the dispatcher and where

Stock could have it notarized. Stock was in a leg brace because of the pulled tendons in his knee and could not drive himself. While there, they were informed that Mason's blood test had come back showing no trace of alcohol in Mason's system. (Plaintiff's Ex. 1, Telephone Transcript 16).

This prompted more telephone conversations, this time between Powers and the police captain, Michael McElroy. Powers asked McElroy if they should take back the DUI ticket or dismiss it through court in light of the blood test results. McElroy advised him to dismiss the ticket through court and to go ahead and serve Mason with the resisting arrest complaint. (Plaintiff's Ex. 1, Telephone Transcript 18). Holton was instructed to keep Mason at the hospital until Stock could get there to serve him the resisting arrest complaint, although Mason had received a medical release from the hospital. (Plaintiff's Ex. 1, Telephone Transcript 17 at 5–6).

Mason was served the complaint and released from police custody within approximately one half-hour from the time Stock was informed of the blood test results. (Doc. 207 at 16). By this time, it was around 3:00–3:15 a.m. on November 8, 1991. Mason was in custody a total of about 3½ hours. (Doc. 191, Uncontroverted Fact at ¶ 36).

Mason testified at the hearing that the first time he received the DUI citation was when Stock returned to the hospital to serve him with the resisting arrest long form complaint, after Mason had been medically discharged. Mason is currently taking the position that Stock, Powers and Holton wrote and served the ticket for DUI after they had learned the blood test results, knowing there was no justification for the charge, so that they would have a basis for the resisting arrest complaint.[6]

---

**6.** Mason bases his current position on Holton's police report which stated, "I then went back to Mr. Mason's room and stood by until Officer Stock arrived with the complaint for resisting arrest. Mr. Mason was served a complaint for resist arrest while I was with Officer Stock. He was give his copies of the traffic citations. He was then released at that time." (Doc. 198, Holton Report, Bates No. 00847).

This has not always been Mason's position. At the state court trial, Mason testified that Stock gave him the DUI citation while Mason was in the hospital bed before Mason was served with the resisting arrest long form complaint. (Doc. 192, Ex. 22 at 41, 43). Before this lawsuit was filed, Mason verified under oath a written notice of claims in which he stated that Stock prepared the DUI complaint "without awaiting the blood

Stock wrote a letter to the city attorney the same day the DUI citation was issued, November 8, advising that he had issued a DUI ticket to Paul Mason, then had received information that Mason's blood test showed point zero alcohol content. (Plaintiff's Ex. 2, Tab 5). Stock requested that, based upon this new evidence, the DUI charge against Mason be dismissed. Mason was not prosecuted for the DUI charge.

The charges for failing to maintain a single lane of traffic and for resisting arrest were prosecuted, and Mason was convicted of both charges in municipal court. (Doc. 191, Uncontroverted Fact at ¶ 38). He appealed his convictions to Sedgwick County District Court. The case was tried to a jury. At the conclusion of the evidence, the district court denied plaintiff's motion for acquittal on the charges. (Doc. 191, Uncontroverted Fact at ¶ 39). The jury found him guilty of failing to maintain a single lane of traffic and not guilty of resisting arrest. (Doc. 191, Uncontroverted Fact at ¶ 39).

After Mason sought an appeal of his municipal court convictions and prior to the jury trial, the city attorney for the City of Haysville offered to dismiss both charges against Mason in exchange for a release of civil liability. Mason declined the offer. (Doc. 191, Uncontroverted Fact at ¶ 40).

### III. *Plaintiff's Claims*

Mason brought this action against Stock, Holton and Powers alleging numerous § 1983 violations.[7] **First,** Mason claims that Stock arrested him, and that Stock, Powers and Holton detained him without probable cause on the DUI and resisting arrest charges in violation of his Fourth and Fourteenth Amendment rights. (Doc. 234 at 14–16). **Second,** Mason claims that Stock used excessive force in arresting him in violation of his Fourth Amendment rights. (Doc. 234 at 16–21). **Third,** Mason alleges that Stock beat him in retaliation for Mason's comment, "Are you going to shoot me like the other

guy? Get another cop out here," in violation of Mason's First and Fourteenth Amendment rights. (Doc. 234 at 21–22). **Fourth,** Mason alleges that Stock and Powers maliciously prosecuted him for the resisting arrest charge in violation of his Fourth and Fourteenth Amendment rights. (Doc. 234 at 22). Plaintiff also brings these four § 1983 claims against the City of Haysville, alleging generally that the city has a practice or custom of "tacitly authorizing the wrongful behavior." (Doc. 234 at 29–30).

Plaintiff also brings several state law claims: **First,** plaintiff seeks recovery from Stock, Holton, Powers and the City of Haysville for battery, false arrest, retaliation and malicious prosecution under the Kansas Tort Claims Act. (Doc. 234 at 16, 20–21 and 27). **Second,** plaintiff brings a claim of fraud and fraud by silence under the Kansas Tort Claims Act against Powers and the City of Haysville, alleging they failed to disclose false and misleading police reports. (Doc. 234 at 27–29).

### IV. *Summary of Defendants' Summary Judgment Motion*

Defendants have moved for summary judgment on several grounds. Because of the number of issues and defendants, it is helpful to lay out and summarize these grounds and identify the portions of the parties' memoranda which address them. The first docket and page notation refer to defendants' memorandum. The second docket and page notation, in **bold** typeface, refers to plaintiff's responses, to the extent a specific response can be identified.

A. *Claims Against the Officers Under § 1983*

1. *False arrest*

- Plaintiff's municipal court conviction bars his claim (Doc. 191 at 19) **(Doc. 207 at 34).**

---

test results." (Doc. 204, Ex. 5 at 10). Mason also testified in his deposition that the DUI "misdemeanor" citation was prepared some time before the resisting arrest complaint. (Doc. 204, Ex. 4 at 206–07, Ex. 5, Bates No. 100028).

7. The claims against Stock and Powers are made against them in their individual and official capacities. The claims against Holton are made against him in his official capacity only.

- Stock had probable cause to make a warrantless arrest for DUI and resisting arrest (Doc. 191 at 20–22).
- Stock and Powers are entitled to qualified immunity (Doc. 191 at 22–23) **(Doc. 207 at 37–38, 43–44)**.

2. *Excessive force*

- Stock is entitled to qualified immunity (Doc. 191 at 16–18) **(Doc. 207 at 35–37)**.

3. *Retaliation for exercise of free speech*

- Stock is entitled to qualified immunity (Doc. 191 at 24–25) **(Doc. 207 at 41–42)**.

4. *Malicious prosecution*

- No valid claim exists under the First, Fifth and Fourteenth Amendments (Doc. 191 at 25–28) **(Doc. 207 at 39–40)**.
- No valid claim exists under the Fourth Amendment (Doc. 191 at 27–28) **(Doc. 207 at 39–40)**.
- Powers and Stock are entitled to absolute prosecutorial immunity (Doc. 191 at 28–29) **(Doc. 207 at 35)**.
- Stock is entitled to absolute testimonial immunity (Doc. 191 at 29) **(Doc. 207 at 40–41 and Doc. 231 at 4–5)**.
- Plaintiff's municipal court conviction bars this claim (Doc. 191 at 29–30).
- Stock and Powers are entitled to qualified immunity (Doc. 191 at 30–31) **(Doc. 207 at 38–39)**.

B. *Claims Against Haysville Under § 1983*

- Plaintiff's constitutional rights were not violated (Doc. 191 at 31–33).
- Plaintiff's claim of inadequate discipline and/or promotion lacks an evidentiary basis (Doc. 191 at 33) **(Doc. 207 at 46–48)**.
- Plaintiff's claim of inadequate citizen complaint procedure lacks an evidentiary basis (Doc. 191 at 34) **(Doc. 207 at 45–46)**.
- The City of Haysville is not liable for the city prosecutor's plea bargain offer (Doc. 191 at 34–35) **(Doc. 231 at 2–4)**.

- The City of Haysville is not liable on plaintiff's "code of silence" theory (Doc. 191 at 35) **(Doc. 207 at 48)**.
- Defendant Powers was not a "policymaker" for whose actions the City of Haysville can be held liable (Doc. 191 at 35–36) **(Doc. 207 at 43–44)**.

C. *State Law Claims*

- No valid claim exists for "fraud by silence" (Doc. 191 at 36–38) **(Doc. 207 at 48)**.
- No valid claim exists for battery, false arrest, retaliation and malicious prosecution (Doc. 191 at 38–40) **(Doc. 207 at 32–33)**.

## V. *Summary Judgment Standards*

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is inappropriate if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 726 (10th Cir.1991). The court reviews the evidence in a light most favorable to the

non-moving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## VI. *Section 1983 Claims Against the Officers*

### A. *Qualified Immunity Standards*

Qualified immunity protects public officials from individual liability in a 42 U.S.C. § 1983 action unless the officials violated "clearly established ... constitutional rights of which a reasonable person would have known." *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir.1996) (citations omitted). A plaintiff initially bears a heavy two-part burden when a defendant pleads the defense of qualified immunity. *Id.* A plaintiff must show (1) that the defendant's actions violated a constitutional or statutory right, and (2) that the right allegedly violated was clearly established at the time of the conduct at issue. *Id.* A plaintiff must articulate with specificity the clearly established constitutional right and the defendant's conduct which violated that right. *Id.* Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Id.*

The burden shifts to a defendant only if the plaintiff successfully carries his two-part burden. At that point, a defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity. *Id.* This requires a defendant to show that there are no disputes of material fact about whether his conduct was objectionably reasonable in light of clearly established law and the information known to the defendant at the time. *Id.*

### B. *Arrest and Detention Without Probable Cause* [8]

#### 1. *Arrest*

 Mason claims that Stock arrested him in violation of his Fourth Amendment rights and seeks recovery from Stock in both his individual and official capacities. (Doc. 234 at 14–16). The official capacity suit against Stock is simply another way of pleading an action against the City of Haysville. *See Hinton v. City of Elwood, Kansas,* 997 F.2d 774, 783 (10th Cir.1993).

To prevail on a claim for damages for a constitutional violation pursuant to § 1983, a plaintiff must establish that a defendant acted under color of state law and caused or contributed to the alleged violation. *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir.1996). The court analyzes the constitutionality of a warrantless arrest under the probable cause standard. *Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995).

 A police officer may arrest a person without a warrant if he has probable cause to believe that person has committed a crime. *Id.* When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (citations omitted). The burden is on plaintiff to show that Stock unreasonably arrested him without probable cause. *See id.* at n. 1.

Mason does not deny that he was driving below the speed limit the evening of November 7. He has stipulated in the proposed pretrial order that Stock was justified in making a traffic stop of Mason's vehicle for failing to maintain a single lane of traffic. (Doc. 234 at 3). Mason does not deny that he drove some distance past the intersection

---

8. Mason makes several claims that his arrest and continued seizure violated his Fourth and Fourteenth Amendment rights. (Proposed Pretrial Order at 15, 20). Because the Fourth Amendment governs pretrial deprivations of liberty, the substantive due process clause of the Fourteenth Amendment has no applicability to such claims.

*Taylor v. Meacham,* 82 F.3d 1556, 1560 (10th Cir.1996). The court therefore addresses plaintiff's arrest and seizure claims under the Fourth Amendment and grants defendants' motion for summary judgment on these claims under the substantive due process clause of the Fourteenth Amendment.

and the evidence at the hearing showed that he stopped abruptly, causing Stock to nearly run into the back of Mason's car. It is undisputed that Mason and Stock had difficulty communicating, and that when Stock asked Mason if Mason had been drinking, Mason replied "yes," and then refused to take a field sobriety test.

■■■ The court finds that Mason's driving, his difficulty communicating with Stock, his admission of having something to drink, and his refusal to take a field sobriety test gave Stock probable cause to arrest Mason for driving under the influence of alcohol. Stock accordingly did not violate Mason's Fourth Amendment rights in connection with his arrest on the DUI charge and is entitled to qualified immunity. Because Stock did not violate Mason's Fourth Amendment rights in arresting him, Mason's corresponding official capacity claim against the City is precluded as a matter of law. *See Hinton v. City of Elwood, Kansas,* 997 F.2d at 783.[9] This ruling also disposes of plaintiff's state law claim of false arrest. *See Wilson II, supra;* and *State v. Hart,* 200 Kan. 153, 434 P.2d 999 (1967).

## 2. *Detention*

Mason claims that Stock, Powers and Holton detained him without probable cause on the DUI and resisting arrest charges in violation of his Fourth Amendment rights. Mason asserts this claim against Stock and Powers in their individual and official capacities. The claim against Holton is in his official capacity only. (Doc. 234 at 16, 21).

■■■ Because the court has found that probable cause existed to arrest Mason for the DUI, the question is now whether Stock, Powers and Holton unreasonably detained Mason after discovering evidence exonerating Mason from the DUI charge. Stock and Powers testified that they knew there were no longer any grounds to detain Mason for the DUI after learning the results of his blood test.

It is undisputed that Mason was held in custody for about 30 minutes after the police learned the blood test results in order to allow Stock and Powers to drive to the hospital and serve Mason papers. According to Mason, the "papers" consisted of both the long form complaint for resisting arrest and the tickets for DUI and failing to maintain a single lane of traffic.

Taking Mason's most recent and self-servicing account of the facts as true for purposes of this discussion,[10] he has not shown that his constitutional rights were violated by the half hour spent in police custody at the hospital. The court sees nothing unreasonable or constitutionally significant about holding Mason long enough to complete paperwork generated by the events of the evening and deliver it. A certain amount of delay is an everyday occurrence in police work; for example, in a routine traffic stop an officer may request a driver's license and vehicle registration, run a computer check and issue a citation before the driver is free to leave. *See e.g., United States v. Miller,* 84 F.3d 1244, 1250–51 (10th Cir.1996). There is no evidence suggesting, and plaintiff does not allege, that he was being held on any sort of pretext. After being served his citations and complaint, Mason immediately left the hospital.

Mason alleges that the resisting arrest charge was trumped up by Stock and that it was therefore unconstitutional to detain him the extra half hour in order to complete and serve the resisting arrest long form complaint. Assuming, but not deciding, that the

---

9. The court recognizes that in the context of municipal liability, there is a difference between finding that an officer is entitled to qualified immunity because he did not violate a plaintiff's constitutional rights and finding that an officer is entitled to qualified immunity because the law was not clearly established at the time a constitutional violation occurred. A finding that an officer is entitled to qualified immunity because the officer's conduct did not violate the law it is equivalent to a decision on the merits of the claim and precludes the imposition of any municipal liability. On the other hand, when qualified immunity is predicated on the basis that the law is not clearly established, the corresponding claim against a municipality may proceed. *See Hinton,* 997 F.2d at 782–83 and *Williams v. City and County of Denver,* 99 F.3d 1009, 1018 (10th Cir.1996).

10. See n. 6, *supra.*

resisting arrest long form complaint could not constitute a basis for detaining Mason after the negative test results on the DUI charge were disclosed, it still was not unreasonable to hold Mason in custody long enough for Stock to serve the indisputably legitimate ticket for failure to maintain a single lane of traffic, which, according to Mason's most recent version of the events, he did not receive until Stock returned to the hospital. Mason does not allege that Stock delayed for an unconstitutional amount of time before issuing Mason the failure to maintain a single lane of traffic citation, and considering all the circumstances of that night, the court finds nothing unreasonable about the manner in which Mason was served his citations.

 The court also notes that there is absolutely no hint of evidence to suggest that Powers or Holton had reason to suspect that the resisting arrest charge was not legitimate. The plaintiff must show a defendant *personally* participated in the alleged violation. *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir.1996). Holton was not present during Mason's arrest and Mason has provided no evidence that Holton observed any of the events which gave rise to the charge of resisting arrest. Although a supervisor may incur liability, there is no strict supervisor liability under § 1983. *Id.* For a supervisor to incur liability based on the conduct of subordinates, it is not enough for a plaintiff to show that the defendant was in charge of other state actors who actually committed the violation, *id.*, nor is a supervisor responsible for violations of which the supervisor had no knowledge. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.1995). There is no evidence that Powers had reason to know or suspect Stock's version of Mason's arrest was not accurate. Powers and Holton are therefore entitled to qualified immunity on the claim that they unreasonably detained Mason. Because their qualified immunity is based upon the court's finding that Mason's constitutional rights were not violated, Mason's official capacity claims against the City fail as well. *See Hinton v. City of Elwood, Kansas*, 997 F.2d at 782–83. This ruling also disposes of plaintiff's state law claim of false imprisonment. *See Wright v. Montgomery*

*Ward & Co., Inc.*, 814 F.Supp. 986, 988–990 (D.Kan.1993), *aff'd*, 25 F.3d 1059 (10th Cir. 1994).

### C. Excessive Force

Mason claims Stock used excessive force when arresting him in violation of his Fourth Amendment rights. The claim is brought against Stock in both his individual and official capacities. (Doc. 234 at 21–22).

 A law enforcement official's liability under 42 U.S.C. § 1983 for a violation of an individual's constitutional rights through the use of excessive force in completing an arrest is well established, and has been since the United States Supreme Court case *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *See Mick*, 76 F.3d at 1135–36. Whether an officer used excessive force during an arrest should be analyzed under the Fourth Amendment's "reasonableness standard," i.e., whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or motivation. *See id.*

The court finds that the facts and circumstances confronting Stock immediately before and during Mason's arrest are disputed and that granting Stock qualified immunity on the excessive force claim is inappropriate. Mason testified at the hearing that he offered no resistance to the arrest and immediately complied with Stock's directives, but that Stock beat him on his shoulders and back and kicked him in the legs. Stock denies all of these claims. The court cannot base its decision on the credibility of witnesses or the weight of the evidence. Because there is a material issue of fact about whether Stock's conduct was objectively reasonable, the court denies Stock's request for qualified immunity on the excessive force claim. *Compare Wilson I*, 52 F.3d 1547, *with Sevier v. City of Lawrence, Kansas*, 60 F.3d 695 (10th Cir.1995).

### D. First Amendment Retaliation

Mason alleges that Stock beat him in response to Mason's comment, "Are you going to shoot me like the other guy? Get another

cop out here," in violation of Mason's First Amendment rights. The claim is brought against Stock in his individual and official capacities. (Doc. 234 at 21–22).

▮▮▮ The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. *City of Houston v. Hill*, 482 U.S. 451, 461–63, 107 S.Ct. 2502, 2509–10, 96 L.Ed.2d 398 (1978). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* "[O]ne is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." *Norwell v. City of Cincinnati*, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) (per curiam) (holding void the arrest of man for being loud and boisterous). Thus, there is a clearly established right against retaliation for constitutionally protected speech. *Id.; Elbrader v. Blevins*, 757 F.Supp. 1174, 1182 (D.Kan.1991).

▮▮▮ It is undisputed that Stock had already decided to arrest Mason for driving under the influence before Mason made his comment, so Mason's arrest is not in issue here. The question is whether Stock beat Mason because of Mason's statement. The court finds a reasonable officer in 1991 would know that hitting and kicking someone because the person said, "Are you going to shoot me like the other guy? Get another cop out here," would violate clearly established law, given the cases cited above.

Because material issues of fact remain as to whether Stock hit or kicked Mason and, if so, whether it was necessary to effectuate Mason's arrest, the court denies Stock qualified immunity on the claim that he violated Mason's First Amendment rights.

### E. *Malicious Prosecution*

Mason alleges that Stock and Powers maliciously prosecuted him for the DUI and resisting arrest charges in violation of his Fourth Amendment rights. The claims are brought against the officers in their individual and official capacities. (Doc. 234 at 22–27).

▮▮▮ The Tenth Circuit recognizes the viability of malicious prosecution claims under § 1983. *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.1996). The common law elements of malicious prosecution are the "starting point" for the analysis of a § 1983 malicious prosecution claim, but the plaintiff must ultimately prove that his Fourth Amendment right to be free from unreasonable seizures has been violated by the defendant's conduct. *See id.* Malicious prosecution alone does not automatically constitute a denial of due process. *Id.*

#### 1. *DUI Charge* [11]

▮▮▮ Mason's malicious prosecution claim regarding the DUI charge is based on his allegation that Stock and Powers issued the DUI ticket after receiving the blood test results, knowing there was no justification for the citation. Assuming, without deciding, that this is true and that plaintiff has met the common law elements of malicious prosecution, the court finds that plaintiff has not met his burden to show that his Fourth Amendment rights were violated by the DUI citation.

Mason was not kept in custody solely on the DUI charge, nor was he ever prosecuted on the DUI citation. Taking Mason's most recent and self-serving version of events as true, he was detained at the hospital for approximately one half-hour after his test results were received by the police. The court has found that this half hour of continued police custody, which allowed the officers to complete and deliver paperwork on the other charges, was not unreasonable. Thus, Mason cannot show that the additional half hour of custody violated his Fourth Amendment right to be free from unreasonable seizure.

Further, there was no prosecution on the DUI citation which could conceivably be construed as a "seizure" for Fourth Amendment

---

11. Mason does not include in the proposed pretrial order his claim that defendants maliciously prosecuted him for DUI, (Doc. 234 at 22–27), but argues it in his brief. (Doc. 207 at 43). The court will nonetheless dispose of the claim on the merits.

purposes. The Tenth Circuit observed that "it is unclear how far the Fourth Amendment's protection against unreasonable 'seizures' can reach in a pretrial context," but noted Justice Ginsburg's concurrence in *Albright v. Oliver*, 510 U.S. 266, 277–80, 114 S.Ct. 807, 815–16, 127 L.Ed.2d 114 (1994), in which she suggested that a person is effectively "seized" for constitutional purposes as long as a prosecution is pending. *Taylor*, 82 F.3d at 1561 n. 5. Here, Stock wrote a letter to the city attorney the same day the DUI citation was issued (according to Mason's version of events) and the charge was dismissed. Mason subsequently was not prosecuted for the DUI charge. There was therefore no "prosecution" and thus no "seizure" for Fourth Amendment purposes. Even if the DUI citation was deliberately unjustified, Mason has not shown that it had any observable effect on his Fourth Amendment rights. Defendants Stock and Powers are entitled to qualified immunity on this claim.

### 2. *Resisting Arrest*

■ Mason claims Stock and Powers maliciously prosecuted him for resisting arrest. Lack of probable cause is an essential element of malicious prosecution under Kansas law. *Lindenman v. Umscheid*, 255 Kan. 610, 624, 875 P.2d 964 (1994). Mason was charged and convicted in municipal court for resisting arrest, but was found not guilty after he appealed to the district court and had a jury trial. Defendants argue that Mason's conviction in municipal court conclusively establishes that there was probable cause to charge him for resisting arrest.

■ A federal court considering a § 1983 action must give preclusive effect to a state court judgment to the same extent a court in that state would. *Hubbert v. City of Moore, Oklahoma*, 923 F.2d 769, 772 (10th Cir.1991). Kansas follows the general rule that the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause unless the conviction was obtained by fraud, perjury or other corrupt means. *See Elbrader v. Blevins*, 757 F.Supp. at 1177–78 (citing Restatement (Second) of Torts § 667(1) (1977) and Kansas law); *see also Bussard v. Neil*, 616 F.Supp. 854, 857 (M.D.Pa.1985) (holding prior traffic conviction conclusively establishes probable cause regardless of reversal upon trial de novo). Thus, Mason's conviction in municipal court for resisting arrest establishes that there existed probable cause for the charge, unless Mason can show that his conviction was obtained by perjured testimony, fraud or corruption.

■ First, Mason attempts to show perjury, fraud or corruption by emphasizing that at the de novo district court trial he testified to his version of events and was acquitted on the resisting arrest charge. The court is not persuaded that this shows his earlier conviction was obtained through improper methods. The jury may not have wholeheartedly believed Mason's testimony but nonetheless afforded him the benefit of the doubt under the high burden of proof applicable in criminal cases. It does not by any means establish perjury, fraud or corruption in the municipal court proceedings.

Second, Mason tries to show that his conviction in municipal court was obtained by improper means by pointing to his own testimony in this court's hearing that Stock perjured himself in municipal court. The court finds this inadequate to cast doubt on the validity of the municipal court proceedings. Mason has presented no concrete proof of Stock's alleged perjury, basing this serious accusation on nothing other than his own version of events surrounding his arrest. This is simply insufficient to establish perjury. *See State v. Barker*, 18 Kan.App.2d 292, 294, 851 P.2d 394 (1993) (perjury cannot be established by only one person's testimony countering another person's testimony); *see also Dukes v. State of New York*, 743 F.Supp. 1037, 1042 (S.D.N.Y.1990) (holding fact that one witness's testimony is at odds with the testimony of other witnesses does not supply a sufficient basis for allegations of perjury). The court finds that Mason has failed to show that his municipal court conviction was obtained through perjury, fraud or other corrupt means and therefore, the conviction conclusively establishes probable cause for Mason's resisting arrest charge.

Furthermore, notwithstanding the conclusive effect of the municipal court conviction, the evidence shows Stock had probable cause to charge Mason with resisting arrest. The undisputed dialogue between Stock and Mason shows that Stock had to tell Mason five times to place his hands on the car, during which time Mason asked Stock if Stock wanted to shoot him like the other guy and told Stock to get another cop out there. Stock testified that he considered Mason's statement "You get another cop out here" as meaning that it would take more than one officer to arrest Mason, that Mason would not be arrested without a fight. In the context of the undisputed facts, this is a reasonable interpretation of Mason's statement. Whatever motivation Mason had for making those statements, Stock could have reasonably taken Mason's comments, coupled with Mason's lack of response to Stock's orders, as combative. It is undisputed that Stock called for backup and that Stock's knee was twisted and injured in the process of handcuffing Mason. The court finds that an officer could reasonably believe that a person was resisting arrest given these circumstances and that there was probable cause to issue the charge.

The court already found that Mason has failed to present any evidence suggesting that Powers had reason to suspect that the resisting arrest charge was not legitimate. The court accordingly grants Stock and Powers qualified immunity on the claim that they maliciously prosecuted Mason for resisting arrest. This ruling disposes of plaintiff's official capacity claims against the City, *Hinton v. City of Elwood, Kansas, supra,* and state law claims of malicious prosecution, *Wright v. Montgomery Ward & Co., Inc., supra* at 990.

### F. Conclusion on Qualified Immunity Defenses

Defendant Stock's motion for summary judgment on the grounds that he is qualifiedly immune is **denied** as to Mason's claims that (1) Stock used excessive force in arresting him in violation of his Fourth Amendment rights, and (2) that Stock beat him in retaliation for the exercise of his First Amendment rights. Defendants' motion is **granted** on all other § 1983 claims. The officers are entitled to qualified immunity on these claims. *See Williams v. City and County of Denver,* 99 F.3d 1009, 1018 (10th Cir.1996) ("The employee is entitled to qualified immunity either if the law was not clearly established or if his conduct did not violate the law.")

### VII. Section 1983 Claims Against the City

Embedded in the fog of each of plaintiff's claims against the officers, (Doc. 234 at 15, 20, 22, 26), as well as plaintiff's claims against the City (*id.* at 29–30), is a contention that the officers' actions resulted from a failure by the City to supervise and discipline officers who violate the civil rights of others, thus constituting a violation of plaintiff's substantive due process rights under the Fourteenth and related Amendments. This contention must be analyzed in accordance with the Tenth Circuit's recent ruling in *Williams, supra,* decided November 6, 1996.

*Williams* holds that a city may incur direct liability under § 1983 in two ways. **First,** a city "may be held liable on the basis of its own [unconstitutional] conduct even if no City employee is found to have committed a constitutional violation in his individual capacity." *Id.* at 1019. The court is required to analyze the City's alleged conduct to determine if it can be properly characterized as arbitrary or conscience-shocking in the constitutional sense. *Id.* at 1020 (citing *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 127–28, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992)). The conduct must shock the conscience of federal judges. *Collins,* 503 U.S. at 126–27, 112 S.Ct. at 1069; *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir.1995). In other words, the "shock the conscience" determination is not a jury question.

*Uhlrig* sets out the matters which the court must consider:

In order to discern whether the facts of the instant case "shock the conscience" so as to rise to the level of a substantive due process violation, we must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for re-

straint in defining their scope, *Collins,* 503 U.S. at 125, 112 S.Ct. at 1068–69; (2) the concern that § 1983 not replace state tort law, *DeShaney* [*v. Winnebago County Dept. of Social Services* ], 489 U.S. [189,] at 202, 109 S.Ct. [998,] at 1006–07 [103 L.Ed.2d 249 (1989) ]; *Medina* [*v. City and County of Denver* ], 960 F.2d [1493,] at 1495 [ (10th Cir.1992) ]; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety, *Collins,* 503 U.S. at 128–29, 112 S.Ct. at 1070–71. Consistent with these principles and our prior cases, *see, e.g., Graham* [*v. Independent School Dist. No. I–89* ], 22 F.3d 991 [ (10th Cir.1994) ]; *Medina,* 960 F.2d 1493, *Collins* explained that the Due Process Clause's protection against "conscience shocking" conduct traditionally only involved deliberately wrongful government decisions rather than merely negligent government conduct. 503 U.S. at 127 n. 10, 112 S.Ct. at 1069 n. 10. *Collins'* focus on deliberateness coheres with our previous recognition that a § 1983 violation must be predicated on a state action manifesting one of two traditional forms of wrongful intent—that is, either: (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm. *Medina,* 960 F.2d at 1496. While "an intent to harm" follows the traditional tort law concept of intentionality, we have defined "an intent to place a person unreasonably at risk" (or reckless conduct) as when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." *Id.*

However, to satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct. We do know, however, that the "shock the conscience" standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist in the workplace is not necessarily conscience shocking. *Collins,* 503 U.S. at 128, 112 S.Ct. at 1070.

(*Id.* at 573–74) (footnotes omitted). Under this standard the court must analyze the City's policies as they relate to the conduct of officers Stock, Powers and Holton, which the court found not to be unconstitutional. The court also must analyze the policies as they relate to the conduct of officer Stock in connection with the excessive force and First Amendment retaliation claims even though a jury may find no constitutional violations.

The court has carefully searched plaintiff's claims in the proposed pretrial order and summary judgment response in an effort to determine whether plaintiff has made a *Collins*-based claim against the City. Even though it was decided in 1992, plaintiff has not cited *Collins* in his response. Plaintiff's contentions in the proposed pretrial order (Doc. 234 at 29–42), his factual claims in the response (Doc. 207 at 22–31) and his arguments regarding the City's § 1983 liability (*id.* at 45–50 and Doc. 231) blindly refuse to admit the possibility that the officers' conduct could be found not to violate the Constitution, which might (but probably does not) explain his failure to acknowledge *Collins.* None of plaintiff's submissions contain any reference to or discussion of "conscience-shocking" conduct or policies of the City.

Under the rules pertaining to summary judgment, a plaintiff who wishes to assert a *Collins'* claim must, at minimum, point to conduct or policies which would require the court to make a "conscience shocking" determination. Even though plaintiff has failed to do so, the court's own review of the evidence has failed to disclose either conduct by a city official or a city policy which shocks the conscience of this court. The court therefore

concludes that plaintiff has not asserted a *Collins*-based claim against the City.

 The **second** way in which a city may incur direct liability requires an unconstitutional act by an employee. "In such cases, the [municipal] policy, even if constitutional, will nonetheless be a basis for municipal liability if that policy amounts to a deliberate indifference to the rights of the public with whom the municipal employee comes in contact." *Williams* at 1020 (referencing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Under this standard, the court must analyze the City's policies as they relate to the conduct of officer Stock in connection with the excessive force and First Amendment retaliation claims because a jury might find that conduct unconstitutional.

The factors which the court must consider in making a "deliberate indifference" determination are footnoted in *Zuchel v. City and County of Denver,* 997 F.2d 730 (10th Cir. 1993):

> On appeal, Denver argues that as a matter of law it can not be found deliberately indifferent because it had some "shoot-don't shoot" training, *see supra* at 739, and thus recognized the problem and was addressing it. In making this argument, Denver ignores the definition of deliberate indifference in *City of Canton:*

> > Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice Brennan's opinion in *Pembaur v. Cincinnati* [475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)], put it: "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.

> > . . . .

> > *The issue in a case like this one . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."* It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But *it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.*

> > 489 U.S. at 389–90, 109 S.Ct. at 1205 (citations omitted) (emphasis added). Thus, a city is deliberately indifferent if (1) its training program is inadequate, and (2) the city deliberately or recklessly made the choice to ignore its deficiencies.

(*Id.* at 740, n. 5) (emphasis in original).

Even though it was decided in 1988, plaintiff has failed to cite *City of Canton* in his response. Nevertheless, it is possible to identify *City of Canton*-type claims in plaintiff's various submissions. They are:

1. Failure to supervise and discipline officers involved in misconduct;

2. "Systematic inadequacies" in handling and investigating complaints of misconduct;

3. Initiation of offers to dismiss criminal charges in exchange for releases of liability; and

4. A "code of silence."

(Doc. 234 at 40–41). The court will analyze these claims to determine (1) whether there is evidence of a policy, i.e., that the City's decision makers made a deliberate choice from alternatives to follow a certain course of action; (2) whether the policy is adequate and, if not, (3) whether the City's decision makers deliberately or recklessly made the choice to ignore the deficiencies of the policy. Evidence of these elements, coupled with evidence of an affirmative link between the policy and the particular constitutional viola-

tion alleged, must be present in order to create a jury issue. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

### A. *Failure to Supervise and Discipline*

 Plaintiff asserts persons other than himself have been abused and in some cases falsely charged by the City's officers who, in turn, were not disciplined and, in some instances, were promoted or given pay raises. (Doc. 207 at 22–25). An example of the evidence offered by plaintiff is his version of the "facts" which became the basis for *Wilson I* and *II:*

> On 12–7–90, Mr. Wilson had an unloaded gun at his home during an interview about a traffic complaint (unobserved by any officer). When forced at gunpoint to produce his hand, after begging not to have to show his hand, he was shot twice by then Officer Meeks and seriously injured, but Lt. Powers directed Officer Stock to handcuff him. Given no first aid, he died from asphyxiation. The City was told by the K.B.I. and Sheriff to do their own investigation, but none was conducted. The reports of Stock, Powers and the Chief are false. Evidence was destroyed and altered. No officer was disciplined, except Det. Lytle who was fired for disclosing that the officers withheld first aid.

A comparison of these "facts" with the facts recited in the Circuit's opinions demonstrates Mr. Berg's proclivity for misstating and exaggerating the facts. There was no unconstitutional conduct by the officers involved in the Wilson case and therefore it cannot serve as the basis for a *City of Canton* claim.

The next incident involved Edwin Gressel. Plaintiff's version of the facts is as follows: Gressel was handcuffed and then kicked by officers after being stopped for a minor traffic violation. He was never interviewed by Haysville police concerning his "beating" and no internal affair file was produced in *this* case, which plaintiff apparently believes is evidence that no investigation was made. Charges were dismissed when Gressel signed a release.

A review of Gressel's testimony shows that there is more to the story. In the early 1980s, Gressel was stopped by an unknown officer for having a defective headlight. Gressel, who had been drinking "earlier that evening" says he was pulled from his car by an unknown officer who attempted to handcuff him. Gressel told the officer that "he wasn't going to put those handcuffs on me" and then hit the officer. Another officer intervened and Gressel shoved him down. Some additional officers arrived who proceeded to "kick the shit out" of Gressel. Gressel admitted that not all of the officers were from the City of Haysville. He could not recognize any of the officers. Gressel's answer to a question regarding whether he filed a complaint is not included in the record. (Doc. 196, Bates Nos. 170–185).

The Rickey and Richard White incident occurred in March 1990. The affidavits of the Whites, prepared for the *Wilson* case by Mr. Berg, aver, in substance, that the pair had an altercation with Haysville police officers arising from a dispute over a parking ticket and a "totally fabricated" traffic stop. The Whites were arrested. Thereafter they retained a highly respected Wichita lawyer, Daniel Sevart, who negotiated a dismissal of charges and partial payment of medical bills in exchange for release of claims. (It does not appear that any claims were actually asserted.)

The White incident was investigated by the Haysville Police Department and reports were made. The reports differ substantially from the Whites' versions of the incident. The Whites' affidavits state, in non-specific and conclusory fashion, that the officers' reports have "facts omitted and false statements of fact in material respects and ignored information of non-police witnesses." (Doc. 196, Vol. 1, Bates Nos. 21–80). The court cannot determine what, if anything, in the reports is not accurate.

Four other "incidents" are cited: Ormond, 1980; Wohlford, 1981; Dirck, 1983; and a "loud party call" in 1989. The Ormond incident involved an altercation which ensued after a traffic stop. An internal affairs investigation conducted in 1980 cleared the officer of any wrongdoing. In 1983, a jury awarded Ormond damages against the City, presum-

ably in a case involving the same incident. Mr. Berg was Ormond's lawyer.

The Wohlford incident, which occurred in 1981, involved a traffic stop which ended in Wohlford being charged with resisting arrest. Wohlford hired Mr. Berg. An internal affairs investigation cleared the officer and in a subsequent trial (the details of which are not in the record), judgment was rendered for the City. Plaintiff declares, as he does with reference to the Wilson case, that the "police reports were false" but offers no evidence to back up this claim.[12]

The facts of the Dirck incident are supported by newspaper articles and other unsworn documents which have no evidentiary value for summary judgment purposes. (Doc. 198, Bates Nos. 819–832). The "loud party" incident is arguably relevant to the extent it shows that an officer was disciplined. Plaintiff's argument that the discipline was not harsh enough is irrelevant and probative of nothing.

In summary, the aforesaid incidents, whether viewed individually or collectively, demonstrate no identifiable policy of the City regarding the supervision and discipline of its officers in connection with excessive force and First Amendment retaliation complaints or, for that matter, any other type of complaint.

### B. "Systematic Inadequacies" in Handling Complaints of Misconduct

The facts on which plaintiff relies to support this claim are as follows:

- Citizens who complain must first see a supervisor. If they wish to make a "formal" complaint, they must contact the Captain during business hours.
- There is no official "complaint form."
- There are no written procedures to be followed by the officers assigned to investigate the complaints.
- Complainants are "rarely interviewed." (Plaintiff supports this claim by refer-

ence to the affidavits of the Whites and Joyce Wilson.)

- Officer Powers testified that when he conducts investigations, he relies on the officer's reports and did not interview certain persons Mr. Berg apparently believed he should interview.
- The Chief of Police writes general orders for the department.
- The Haysville City Counsel does not provide oversight of police misconduct complaints.
- The Chief requires proof "beyond a reasonable doubt" to substantiate complaints.
- "Long-standing" members of the police department deposed in this case were unaware of discipline meted out by the Chief involving complaints.

(Doc. 207 at 25–27).

▪ Plaintiff has offered no evidence to show that any of these alleged "systematic inadequacies" constitute a policy made as the result of a deliberate choice between alternatives. Assuming, without deciding, that some of the alleged inadequacies can be considered a policy (e.g., lack of an official complaint form and written procedures to be followed in the investigation of complaints), plaintiff has presented no identifiable evidence that the policies are inadequate. Finally, even if there was evidence to show that some of the policies are inadequate, plaintiff has presented no evidence to show that the City's choice of a policy was made deliberately or recklessly, ignoring its deficiencies.

### C. Offers and Agreements to Drop Criminal Charges in Exchange for Release of Liability

▪ The facts on which plaintiff relies to support this claim are the Gressel and White incidents, discussed · above, and the offer which plaintiff rejected. (Doc. 207 at 19–20 and 46–47)[13]

---

**12.** Plaintiff's point, to the extent one can be discerned, appears to be that the jury's finding in the Ormond trial somehow validates his claim that the internal affairs' investigation contained "false" police reports. He reaches the same conclusion in the Wohlford case, even though the

jury found for the City. Plaintiff's point fails for logic, if nothing else.

**13.** Plaintiff asserts that "In every one of the mentioned cases [Wilson, Dirck, Wohlford and Gressel] none of the charges were sustained, but

Plaintiff cites two Tenth Circuit cases in support of this claim: *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423 (10th Cir.1984) and *Hammond v. Bales,* 843 F.2d 1320 (10th Cir.1988).[14] *Lusby* involved a police officer who brought and pursued knowingly false shoplifting charges against the plaintiff. Both the officer and TG & Y, where the alleged offense occurred, failed to tell the prosecutor that the charges were groundless and the charges thus pended for several months. The officer and TG & Y "actively bargained" with the plaintiffs, seeking a release of civil liability before the officer and TG & Y would drop the charges. The court found that this was the type of egregious misuse of the legal process which is actionable under § 1983. *Id.* at 1431.

The City of Lawton, Oklahoma was a defendant in *Lusby* and the Circuit affirmed a jury verdict against Lawton, finding evidence of "an impermissible city policy that delegates a nondelegable duty and facilitates private use of criminal charges" sufficient for § 1983 liability. *Id.* at 1432. Plaintiff contends that *Lusby* "is still controlling law," apparently unaware that the Supreme Court *vacated* the judgment as to Lawton and remanded the case for further consideration in light of *City of Oklahoma City v. Tuttle.*

On remand, the Circuit found that even though the district court's "one incident" jury instruction was almost identical to the instruction found to be erroneous by the Supreme Court in *Tuttle,* reversal was not required because no objection was ever made to the instruction. 796 F.2d 1307 (10th Cir. 1986).

The court finds little in *Lusby* to support plaintiff's § 1983 claims against the City. To the extent *Lusby* remains valid law, the egregious conduct which justified § 1983 liability against the officer and TG & Y is absent from the facts of this case. The facts in

*Lusby* involved an apparently innocent plaintiff whose criminal case pended for several months. Here, the only criminal charge of which plaintiff was "innocent" was DUI, which was dismissed within hours. Plaintiff was never "innocent" of the other charges. There was more than sufficient evidence to justify his prosecution on the other charges. The fact that he ultimately was acquitted on the resisting arrest charge is not the equivalent of innocence. Plaintiff's interpretation of *Lusby*—that any settlement of civil liability in return for dismissal of criminal charges creates § 1983 liability against a city—is clearly unfounded.

The court finds that offers of compromise in three unrelated incidents occurring over a 12–year period do not raise a jury issue whether the offers constituted a city policy.[15]

### D. *The "Code of Silence"*

It is tempting to dispose of this claim by reference to Judge Porfilio's comments in *Wilson I* about the "code of silence" claim made in that case. Nevertheless, the court will deal with the claim in the context of the City's liability under § 1983.

The evidence upon which plaintiff relies for his "code of silence" claim is set forth in disjointed fashion (Doc. 207 at 27–31). It consists of "general orders" written by, and comments of the police chief during departmental meetings, to the effect that officers are not to discuss police business with persons not involved with the police department. Some of the general orders pertain to the complaints of plaintiff and other individuals cited, *supra.* (Doc. 198, Bates Nos. 637–668).

Plaintiff also relies on the following snippets of deposition testimony by the chief:

> Q. Chief, do you know what the term code of silence is?

all were used to at least attempt to cover reduce civil liability." (Doc. 202 at 46). The court finds there is no evidence to support this assertion. Rather, it is but one of many examples of the conduct referred to by Judge Porfilio in *Wilson I.*

**14.** *Hammond* involved a question of prosecutorial immunity. Municipal liability under § 1983 was not an issue.

**15.** It is unnecessary to deal with defendants' argument that the City cannot be held liable for the city attorney's proffered plea agreement. (Doc. 191 at 34–35).

A. Sure I do.

Q. Tell me what you think that means.

A. Code of silence is a term that cannot only be used in police work but other businesses as well, that you have a code of silence that you don't tell on each other to make it a basic stand or you don't have anything bad to say about anyone.

\* \* \* \* \* \*

Q. Would you consider the police officers writing false reports to cover for an allegation of misconduct to be a code of silence in operation?

MS. GIRARD: You mean in general? Is that just in general?

Q. Yes, in general?

MS. GIRARD: If that were happening.

MR. BERG: Yes.

THE WITNESS: If they were intending to do that on purpose to make false reports, it would be a part of—could be a part of a code of silence.

Q. And if they were testifying to less than the whole truth in court to avoid allegations of police misconduct, would that be consistent with your understanding of a code of silence?

A. If they did it with malice and intent to deceive the judge and/or the jury, that with that intent and malice could be a part of the code of silence.

Q. What if the officers like Holton simply said, I don't remember, when they in fact had made a record of their recollection. Would that be consistent with your understanding of a code of silence?

A. I'm sorry, you'll have to do that one again.

Q. I'm not just talking about fabricating evidence or perjury, I want to ask you about a simpler thing. Saying I don't remember when in fact they had a record to show specifically what they were asked. Is that consistent with the code of silence?

A. Based upon just sitting here today, it may have been in writing and he did not recall that it was in writing.

(Doc. 196, Bates at 320–322).

Finally, plaintiff apparently relies upon opinions in reports in this case and *Wilson* prepared by Edmond Lester. (Doc. 199 at 1096, 1111). The qualifications, if any, of Mr. Lester to give opinions on any subject are not provided in the record. His "reports" are not in affidavit form. For these reasons, Mr. Lester's "opinions" have no evidentiary value for summary judgment purposes.

The court finds that plaintiff has wholly failed to present evidence of the existence of a "code of silence" policy. Instructions by the chief that officers should not engage in unauthorized discussion of police business are not evidence of a "code of silence." The fact that the chief can define "code of silence" does not mean that the department has a "code of silence" policy. The constant refrain of Mr. Berg's never-supported allegations regarding false testimony by officers is not evidence of a "code of silence."

### E. Conclusion Regarding Municipal Liability Under § 1983

Having examined each of the claims in the light most favorable to plaintiff, the court concludes that no jury issue has been shown to exist with respect to any of the claims. Accordingly, the City's motion for summary judgment is granted in its entirety.

## VIII. State Law Claims

Plaintiff asserts the following state law claims:

- Battery against Stock and the City. (Doc. 234 at 16)
- False arrest against all defendants. (*Id.* at 16 and 20–21).
- Malicious prosecution against all defendants. (*Id.* at 27).
- Fraud and fraud by silence against Powers and the City. (*Id.* at 27–29).

The state claims of battery, false arrest and malicious prosecution were first made in the complaint in case No. 93–1437 filed November 8, 1993.[16] No state claims of any

---

**16.** The state claims were pled as follows: *Jurisdiction*

kind were made in case No. 92–1539, even when plaintiff sought leave to amend. See this court's Memorandum and Order of November 30, 1994. (Doc. 165 in case No. 92–1539 at 11).

The Kansas statute of limitation for battery, assault, malicious prosecution and false imprisonment is one year. K.S.A. 60–514(b). Clearly, the claims are barred by the statute. *Cowdrey v. City of Eastborough, Kansas,* 730 F.2d 1376, 1379–80 (10th Cir.1984).

 Plaintiff did not make a recognizable response to defendants' statute of limitation argument regarding his claims of battery, false arrest and malicious prosecution. Nor has he claimed that the state claims somehow should "relate back." However, to foreclose any such argument, the court finds that plaintiff's state law claims in case No. 92–1437 cannot be considered amendments of the claims in case No. 92–1539 for the purposes of Fed.R.Civ.P. 15(c). *Kansa Reinsurance v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1367 (5th Cir.1994). ("As the district court observed, '[t]he necessary implication of the rule is that in order for an amended pleading to relate back for statute of limitations purposes, there must be a previous pleading to which the amendment dates

back.'") A separate case does not constitute a previous pleading.

 Plaintiff's fraud and fraud by silence claim is two-pronged. He first claims that Powers knew of the negative blood alcohol results before the DUI ticket was issued. Second, he contends that Powers "knew that the decision to file and issue a resisting arrest charge was likewise made after it was obvious Mr. Mason was being wrongly held on a false D.U.I. charge." Plaintiff then proceeds into a relatively incomprehensible argument [17] to the effect that Powers and the City failed to communicate to plaintiff during the municipal court proceeding the allegedly fraudulent decision to issue the DUI ticket. Plaintiff claims that he did not become aware of the "fraud by silence" until August or September, 1993.

The elements of fraud by silence are set forth in PIK 2d 14.42:

1. The defendant has knowledge of material facts which plaintiff did not have and which the plaintiff could not have discovered by the exercise of reasonable diligence;

2. The defendant was under an obligation to communicate the material facts to the plaintiff;

---

This action is brought pursuant to 42 USC § 1983 and § 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 USC § 1331 and 1343(3) and (4) and the aforementioned constitutional and statutory provisions. *Plaintiff further invokes the pendant jurisdiction of this Court to hear and decide claims arising out of state law, pursuant to the Judicial Improvements Act of 1990, § 1367, as supplemental jurisdiction over said state law claims which are also related to the federal statutory and constitutional claims raised herein, that they form part of the same case or controversy.*
(Emphasis supplied).

17. *See Wilson II,* 98 F.3d at 1255. The argument is as follows:

The HPD phone log [Andrews Rpt V.4, p. 946–7] produced on 8-27-93, compared to Stack's Report, 11-8-91 [V.3,p. 712] revealed a lack of disclosure. All incoming calls are required to be logged or they can't be found [Roads V.2, p. 456–7]. His report cited an incoming call at "0242 hours" at the police station, that was not logged. Stock reported a specific unlogged call. Holton, Powers,

Roads, McElroy, Meeks and Stock obviously knew about the other unlogged recordings they had made of the events, like "I know he's going to sue us, I would", before Mr. Mason's D.U.I. ticket was written or served; and telling Holton to not write or book Mr. Mason, just hold him, until Stock got there. It was unknown until the produced recordings were transcribed on 9-13-93, that Stock and Powers had participated in charging D.U.I. and deciding to dismiss it after the .0 results were back, but before Mr. Mason had been issued any charge. The recordings reflect that they charged 'resist arrest', because of the threat of suit. Before production, Mr. Mason had no way to know or prove he was charged and prosecuted, because he had been seized, beaten and had threatened suit.

The police are not travel agents and cannot withhold evidence of lack of probable cause. In a criminal case their is a clear duty to disclose. The reasons the phone calls were not logged or disclosed, is simply like the Chief defined it, a Code of Silence in action, to protect the officers from the effects of their constitutional violations. The state statute of limitations, (1 year) started running two months before the action was filed.

3. The defendant intentionally failed to communicate to plaintiff the material facts;

4. The plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff, and

5. The plaintiff sustained damages as a result of the defendant's failure to communicate this to the plaintiff.

A fact is material if it is one to which a reasonable man would attach importance in determining his choice of action in the transaction in question.

A party is justified in relying without investigation upon another to communicate the facts material to a transaction unless he knows or has reason to know of facts which make his reliance unreasonable.

The plaintiff's evidence must be clear and convincing, both at trial and to defeat summary judgment. The court finds that plaintiff has failed to produce such evidence.

First, there is no clear and convincing evidence that Powers knew about the blood alcohol test results at the time the DUI citation was issued. Plaintiff has told different stories regarding when the DUI citation was issued. See n. 6, *supra.* One of his stories is that the citation was issued *before* the results were known. His other story is that the citation was issued *after* the results were known. This is not even clear and convincing evidence of when the citation was issued, much less Powers' knowledge of it.

The evidence is that Powers became aware, after the citation was issued, of the negative test results and that he participated in discussions about how the citation was to be dismissed. This is not clear and convincing evidence that the resisting arrest charge was trumped up to somehow cover or justify the dismissed DUI citation, much less that Powers committed fraud by silence in connection to the resisting arrest charge. The court has found that independent probable cause existed to charge and pursue the resisting arrest charge. The court further finds that the "facts" which plaintiff contends Powers should have disclosed were not material to the resisting arrest case. Even if they could be considered material, plaintiff has

failed to show by clear and convincing evidence that Powers intentionally failed to disclose them.

Accordingly, defendants' motions for summary judgment are **granted** as to all state law claims.

## IX. *Orders*

A. All defendants' motions for summary judgment are **granted** except defendant Stock's motion with respect to plaintiff's claims of excessive force and First Amendment retaliation, which is **denied.**

B. On or before February 14, 1997, defendants' counsel shall file and serve a final pretrial order covering the remaining claims, defenses and issues of both plaintiff and defendant. Counsel may use the proposed pretrial order as a guide but should endeavor to simplify where possible. On or before February 21, 1997, plaintiff may file and serve written objections to the order, along with amended information regarding his witnesses, exhibits and damages. The objections must be succinct and have a solid basis in both fact and law. Plaintiff shall list only those witnesses and exhibits he actually expects to call and use at trial on the remaining claims of excessive force and First Amendment retaliation. The court is weary of, and will not tolerate, any more of plaintiff's prolix submissions. Thereafter, the court will hold a final pretrial conference.

C. A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 pages and shall strictly comply with this court's Rule 7.3 and the standards enunciated by this court in *Comeau v. Rupp,* 810 F.Supp. 1172, 1174 (D.Kan.1992). The response to any motion for reconsideration shall not exceed 5 pages. No reply shall be filed.

IT IS SO ORDERED.