2026 UT App 82

# THE UTAH COURT OF APPEALS

MOUNTAIN WEST TOWING, ET AL.,[1]
Appellees and Cross-appellants,
*v.*
WEST JORDAN CITY, ET AL.,[2]
Appellants and Cross-appellees.

Opinion
No. 20240498-CA
Filed May 21, 2026

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 180909099

James C. Phillips, H. Christopher Bartolomucci, and
Joshua J. Prince, Attorneys for Appellants and
Cross-appellees

April Hollingsworth and Katie Panzer,
Attorneys for Appellees and Cross-appellants

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1 Mountain West Towing bought property in West Jordan, Utah, for use as a commercial towing lot. The company and

---

1. Additional appellees and cross-appellants include Lisa Butcher, Advantage Auto & Towing, William Butcher, Quality Auto & Towing, Penny Butcher, West Bench Towing, Barbara Butcher, All Mountain Towing, Cory Fox, Ready Set Tow, LeeAnn Doppel, GW Towing, and Alberto Gaston Wachterdorff.

2. Additional appellants and cross-appellees include Kiel Coomes and Brock Hudson.

several others operated tow lots from the property for several years until the city ordered them to shut down. The companies and their owners then sued the city and two of its employees for damages and injunctive relief. Prior to trial, the court dismissed the claims against the city's employees and, for procedural reasons, excluded evidence of the plaintiffs' "economic damages." After trial, a jury awarded the individual plaintiffs—the owners of the towing companies—nearly $1.3 million in "emotional distress damages," and the district court denied the plaintiffs' requested injunctive relief but granted the plaintiffs most of their requested attorney fees. Both sides appeal, raising various challenges. We ultimately conclude that all of the plaintiffs' claims either were properly dismissed or should have been dismissed. We therefore affirm in part and reverse in part.

BACKGROUND

*Mountain West Purchases the Property*

¶2    In 2012, Mountain West Towing (Mountain West) purchased a parcel of land (the Property) in West Jordan. Before the purchase, Lisa Butcher, Mountain West's owner, had inquired with West Jordan City (the City) about using the Property as a tow yard.[3] A City employee told Lisa that the Property already had the required conditional use permit (CUP). All she needed to do, according to the employee, was resurface the Property's parking lot with "concrete, asphalt, or recycled asphalt" and obtain the City engineering department's

---

3. "Because many of the individuals in this case share the same last name, we follow our usual practice of referring to them by their [given] names, with no disrespect intended by the apparent informality." *Brown v. Amidan*, 2025 UT App 144, ¶ 1 n.1, 579 P.3d 1075 (cleaned up).

approval.[4] With this information, Lisa went forward with the purchase of the Property. She then acquired a land disturbance permit to place a "new crushed asphalt surface" on the lot, and she hired contractors to prepare drawings and complete the resurfacing.

¶3    Lisa then began operating Mountain West from the Property. Some of her family members also started running their own towing companies from the Property, including her husband, Cory Fox; her mother, Barbara; her brother, William (Bill); and Bill's wife, Penny. At some point, LeeAnn Doppel and Gaston Wachterdorff began operating tow companies of their own from the Property as well.[5] The plaintiff companies operated from the Property for several years and generated a significant portion of their revenue by securing spots on various police departments' tow rotations, including the City's.[6]

¶4    The plaintiff companies each submitted an application (Application) to be on the City's rotation. In so doing, they signed the Application, which contained a provision indicating

---

4. The employee apparently failed to mention that the CUP allowed for storage of only up to ten vehicles at a time on just 2,000 square feet of the Property. The Property is approximately 67,500 square feet.

5. We refer to Lisa, Cory, Barbara, Bill, Penny, LeeAnn, and Gaston collectively as the plaintiff owners. We refer to the companies owned by the plaintiff owners as the plaintiff companies.

6. A tow rotation is a list of tow companies that police departments will use on a rotating basis to secure a tow for a vehicle within their jurisdiction that has been in a crash, has been abandoned, or is otherwise inoperable. Although the City's police department ran the tow rotation, we refer to it as the City's tow rotation.

they "accept[ed] the conditions of the West Jordan Police Policy No. 045" (Directive 45) and "accept[ed] responsibility for the actions of [their] owners, agents, and employees as they relate to [Directive 45] and d[id] so with the full understanding that inclusion on the towing rotation [was] voluntary and a discretionary privilege extended by the West Jordan Chief of Police, or his designee, and [was] not a legal right." Directive 45 outlined a procedure under which the City could remove or suspend companies from the tow rotation. Specifically, it created a "suspension scale" that, based on the severity of the violation or infraction, provided for anything from a "10-day warning notice" to a "3-month suspension or permanent removal from the rotation." It provided that "[a] tow company, whose business, yard, trucks, or employees are not in compliance with the requirements set forth [therein], *may be* suspended and/or removed from the [City's] approved list of tow service providers." Directive 45 also set forth an appellate procedure for companies to challenge their removal or suspension from the tow rotation.

*The City Orders the Plaintiff Companies to Stop Using the Property*

¶5     At some point, Bill and LeeAnn began voicing concerns that other companies on the City's tow rotation were receiving preferential treatment at the plaintiff companies' expense. The complaints eventually led the City's tow rotation coordinator (Coordinator) to send an email to every company on the rotation indicating that the City would increase enforcement of its policies. Sometime after that, Coordinator inspected the Property and determined that some of the vehicles on the lot were parked too closely together in violation of Directive 45. Coordinator warned Penny and Bill in November 2016 about the issue and removed their companies from the rotation two weeks later when the City determined that they hadn't addressed the problem.

¶6     Believing that Coordinator was biased against him, Bill asked the City's chief of police (the Chief) to reinspect the

Property, and he agreed to do so.[7] When he inspected the Property, however, the Chief discovered issues he believed went beyond vehicle spacing. He then asked the City's manager of code enforcement (Manager) to determine whether there were any code violations on the Property. Manager investigated and found that the plaintiff companies had "operated outside" the applicable CUP because the plaintiff companies were using far more than 2,000 square feet to operate the tow lots. *See supra* note 4. After his investigation, Manager issued a "Notice of Violation," dated February 8, 2017, informing Mountain West that it needed to obtain a CUP "to operate a towing and/or salvage yard" on the Property and that the plaintiff companies "must cease operation until [the CUP] is obtained." On February 14, Manager informed the plaintiff companies that Mountain West was "in violation of city ordinance" because it did not have a CUP and that "all businesses . . . currently operating at [the Property] need[ed] to immediately cease operations and vacate [the Property] by March 20, 2017." He removed the plaintiff companies from the City's tow rotation without notifying them.

¶7    The City maintains that, while it was investigating the potential violation of Directive 45, it determined that the Property was located in a "watershed overlay protection zone" and less than 250 feet away from a drinking water well. For this reason, the City claimed that it was concerned about fluids leaking from wrecked vehicles seeping into the ground and contaminating drinking water. Lisa and Cory subsequently claimed that the

---

7. The plaintiffs contend that they disputed at trial whether Bill asked the Chief to reinspect the Property. However, Coordinator testified that Bill personally asked the Chief to inspect the Property, and the plaintiffs point to nothing other than their counsel's assertion during the proceedings below that the issue was disputed to support their contention. Because counsel's assertion was not evidence, *see, e.g., State ex rel. Div. of Forestry, Fire & State Lands v. Six Mile Ranch Co.*, 2006 UT App 104, ¶ 31 n.10, 132 P.3d 687 ("[A]rgument of counsel is not evidence."), we treat this fact as definitively established.

City's mayor told them that the police department had a more sinister reason for its conduct—it "obviously" had a "vendetta" against the plaintiffs.

¶8 Initially, Lisa tried to work with the City to bring the Property into compliance. In May 2017, the City approved a new CUP for the Property, detailing seventeen conditions with which Mountain West needed to comply to use the Property as a tow lot again. By the next month, however, Mountain West had "stopped all efforts to comply" with the new CUP, and the CUP expired in May 2018.

### The Plaintiffs Sue the City, Manager, and Coordinator

¶9 In December 2018, the plaintiffs sued the City, Manager, and Coordinator. In their amended complaint, the plaintiffs alleged that the City shut down the Property and removed the plaintiff companies from the tow rotation based on pretext. The plaintiffs further alleged that the City's actions effectively removed the plaintiff companies from all other police departments' tow rotations because they could no longer operate. These actions, taken together, allegedly caused the plaintiffs millions of dollars in damages. As relevant on appeal, the plaintiffs asserted due process and equal protection claims under 42 U.S.C. § 1983 (section 1983) and a zoning estoppel claim under state law.[8] They sought damages, injunctive relief, and attorney fees.

### Pretrial Matters

¶10 After the close of discovery, the City—pursuant to rule 26(d)(4) of the Utah Rules of Civil Procedure—sought to exclude

---

8. The plaintiffs also asserted claims for negligence, intentional interference with economic relations, breach of contract, and breach of the implied covenant of good faith and fair dealing. The court dismissed each of these claims prior to trial, and those claims are not at issue in this appeal.

one of the plaintiffs' witnesses, as well as all evidence of the plaintiffs' "economic damages." The court granted both requests. The City also moved for summary judgment on the plaintiffs' section 1983 claims. Concluding that those claims were not "based on a clearly established statutory or constitutional right," the court determined that Coordinator and Manager were entitled to qualified immunity and granted summary judgment in their favor on those claims. However, the court found that there were genuine issues of material fact regarding whether the City had violated the plaintiffs' equal protection and due process rights and therefore denied the motion to the extent it sought dismissal of those claims against the City.

¶11 The plaintiffs also moved for partial summary judgment, asking the court to rule, as a matter of law, that they had a property interest in remaining on the tow rotation. The court concluded that once the plaintiffs were added to the rotation, Directive 45 gave them that property interest. The court based its conclusion on the fact that the policy gave penalized companies a right to appeal the City's determination.

*Trial and Post-Trial Matters*

¶12 The case proceeded to a jury trial. Before the parties began putting on evidence, the district court raised a threshold question about whether the plaintiff owners had standing to recover damages based on injuries allegedly suffered by the plaintiff companies. The plaintiffs argued that the plaintiff owners had standing because "their constitutional rights, as individuals, were violated." In response, the City argued that the plaintiff owners' rights were not violated because they had not been removed from the rotation. The court ultimately determined that the plaintiff owners had standing to seek emotional distress damages from the City.

¶13 The witnesses testified to the facts stated above. With the exception of Gaston, the plaintiff owners also testified that the City's actions "harmed them in ways separate and unique from

the harm caused to the [plaintiff companies]." Bill testified that, before the events that gave rise to the litigation, the family would frequently get together for "Christmas," "birthdays," and "all that stuff." But after the plaintiff companies were ordered to cease operations and vacate the Property, Lisa and Cory blamed Bill for the problems with the City, and Bill likewise blamed Lisa. Cory testified that the family still tried to spend holidays together but that, when they did so, "it was like oil and water" and "just didn't work." Bill and Penny similarly testified that prior to the events, they rarely argued but that their marriage deteriorated after the plaintiff companies were shut down. For her part, Barbara testified that the fighting "upset [her] really bad" and that she just wanted her family "to get along" and be "normal."

¶14　The plaintiffs also put on evidence that another tow company on the City's rotation operated under a CUP requiring that it have a paved lot "to protect the water table from contamination by leaking oil and gasoline." Despite the requirement, the company had not paved its lot with the required materials, yet the City did not take any action against that company.

¶15　After the plaintiffs rested their case, the City moved for a directed verdict on the section 1983 claims. The court initially denied the motion. But at a later point in trial, the court revisited part of its ruling and directed a verdict in favor of the City on the plaintiffs' substantive due process claims, concluding that the City's actions did not shock the conscience as a matter of law.

¶16　After the case was submitted to the jury, and after deliberation, the jury determined that the City had violated the plaintiffs' rights to procedural due process. It also determined that the City had violated Lisa's and Mountain West's equal protection rights. The jury awarded a total of nearly $1.3 million in damages to the plaintiff owners, as well as nominal damages of $1 to each of the plaintiff companies.

¶17　The court had determined that the zoning estoppel claim was to be decided by the court and not by the jury, and it asked

that the parties brief the matter after the evidence had been submitted. Following oral argument on the issue, the court ruled against the plaintiffs based on Lisa's failure to comply with the requirements of the land disturbance permit and related drawings when she had the Property's parking lot repaved. Specifically, the court found that evidence from the plaintiffs' "own engineer show[ed] that [Lisa] and Mountain West . . . failed to install . . . six inches of road base prior to installing 3 inches of recycled asphalt and failed to apply any asphalt sealer or binding agent over the recycled asphalt." The court thus denied the plaintiffs' zoning estoppel claim because they had not complied with the "conditions in the very permits they claimed to have relied upon."

¶18 Finally, after the jury rendered its verdict and the court decided the zoning estoppel claim, the plaintiffs asked the court to award them more than $500,000 in attorney fees as prevailing parties under 42 U.S.C. § 1988. The court awarded the plaintiffs most of their requested attorney fees. But it reduced the award by a little over $40,000 based on hours that counsel billed on "two unsuccessful matters," including the zoning estoppel claim and an interlocutory appeal that is not relevant for purposes of the instant appeal.

¶19 The City appeals, and the plaintiffs cross-appeal.

ISSUES AND STANDARDS OF REVIEW

¶20 In its appeal, the City raises several issues. First, it challenges the district court's determination that the plaintiff owners had standing to recover emotional distress damages. "We generally review challenges to standing as a mixed question of fact and law because they involve the application of a legal standard to a particularized set of facts. We defer to the district court's factual determinations but give minimal discretion to determinations of whether a given set of facts fits the legal requirements for standing." *Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 42, 554 P.3d 998 (cleaned up).

¶21    The City also maintains that the district court should have dismissed the plaintiffs' procedural due process and equal protection claims because (1) the plaintiffs lacked a property interest in remaining on the City's tow rotation and (2) the Property's location in a "drinking water protection zone" and close proximity to a drinking water well required the plaintiffs to establish that another tow company on the rotation had been allowed to operate in the same type of area. Constitutional issues present "questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (cleaned up).

¶22    Finally, the City argues that the district court erroneously awarded the plaintiffs most of their requested attorney fees. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Kenny v. Rich*, 2008 UT App 209, ¶ 23, 186 P.3d 989 (cleaned up). However, we review a court's determination that a party is entitled to fees as a "prevailing party" under 42 U.S.C. § 1988(b) for an abuse of discretion. *See Jacob v. Bezzant*, 2009 UT 37, ¶ 32, 212 P.3d 535.

¶23    In their cross-appeal, the plaintiffs challenge several of the district court's rulings.[9] First, the plaintiffs argue that the court erred in denying their zoning estoppel claim. On an equitable claim, "we defer to a district court's factual findings unless there is clear error, but we review its legal conclusions for correctness." *Berrey v. Brown* (*In re Estate of Berrey*), 2024 UT App 21, ¶ 13, 545 P.3d 314 (cleaned up). "However, because of the fact-intensive nature of equitable doctrines, we grant the district court broader discretion in applying the law to the facts." *Id.* (cleaned up).

¶24    The plaintiffs also assert that the district court erred in determining as a matter of law that the City's actions did not

---

9. As we explain, *see infra* note 22, our resolution of the City's arguments renders moot all but two of the issues the plaintiffs raise, so we need not recite the applicable standards of review for the other issues.

shock the conscience as required to establish a substantive due process claim. As noted, constitutional issues present questions of law that we review for correctness. *Jordan River Restoration Network*, 2012 UT 84, ¶ 47.

ANALYSIS

## I. The City's Appeal

### A. Standing

¶25 At the outset of trial, the district court determined that the plaintiff owners had standing to recover emotional distress damages based on injuries allegedly suffered by the plaintiff companies. The City argues that the court's ruling was erroneous because those damages are derivative of harm caused to the plaintiff companies. We agree with the City and therefore vacate the jury's award of damages to the plaintiff owners.[10]

¶26 "The general rule is that a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Shelledy v. Lore*, 836 P.2d 786, 789 (Utah 1992) (cleaned up). In the corporate context, this means that the company itself is the proper party to bring a legal action

---

10. The plaintiffs argue that the City has "failed to marshal the evidence and thus cannot challenge any factual finding" regarding the plaintiff owners' standing. The plaintiffs' argument rests on a faulty premise "[b]ecause the challenge here is not directed at the [district] court's factual findings." *Schmith v. Schmit*, 2025 UT App 124, ¶ 9 n.1, 577 P.3d 365. Instead, the City challenges the court's legal conclusion that the "facts fit[] the legal requirements for standing." *Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 42, 554 P.3d 998 (cleaned up). In other words, the dispute is legal, not factual, so the City does not need to marshal the evidence on this issue. *See Schmith*, 2025 UT App 124, ¶ 9 n.1.

when it is injured, not "the shareholders who experience loss due to their pecuniary interest in the business." *Stone Flood & Fire Restoration, Inc. v. Safeco Ins. Co. of Am.*, 2011 UT 83, ¶ 34, 268 P.3d 170. While an exception allows shareholders to sue when they "experience[] a distinct injury that is not derivative of the harm to the corporation, . . . shareholders have no standing to pursue a claim of intentional infliction of emotional distress based on the destruction or degradation of the corporation." *Id.* ¶¶ 35–36. The exception is "narrow" and applies only when "the wrong itself is a violation of a duty arising from a contract or otherwise" and is "owed directly to the shareholder." *Stocks v. United States Fid. & Guar. Co.*, 2000 UT App 139, ¶ 11, 3 P.3d 722 (cleaned up); *see also Audio Odyssey, Ltd. v. United States*, 243 F. Supp. 2d 951, 959 (S.D. Iowa 2003) ("A 'distinct' injury is one in which the claimant's rights have been violated, not merely one in which the claimant is indirectly harmed because of one party's injury to another." (cleaned up)), *aff'd*, 373 F.3d 870 (8th Cir. 2004).

¶27   In *Stone Flood*, a company's place of business was destroyed in a fire. 2011 UT 83, ¶ 3. The company filed a claim with its insurer, and although the insurer initially suspected arson, it paid nearly $1.2 million under the policy "within ten months of the fire." *Id.* ¶¶ 4–5. Nonetheless, the company and its owners sued the insurer, alleging that its untimely payments caused the plaintiffs' "financial collapse" and asserting various claims sounding in contract and fraud. *Id.* ¶¶ 6, 8. The owners also asserted a claim for intentional infliction of emotional distress (IIED). *Id.* ¶ 8. The district court determined that the owners' emotional distress was derivative of the damage done to the company by the insurer's "alleged failure" to cover the company's losses and the company's "resulting collapse." *Id.* ¶ 11. For this reason, the court concluded that the owners lacked standing to sue for emotional distress and granted summary judgment in favor of the insurer on the IIED claim. *Id.*

¶28   The owners appealed, arguing that they "asserted distinct and palpable injuries that [were] not derivative of the harm" to the company in that (1) "they were forced to mortgage their home

to obtain operating funds" for the company, (2) "they had to personally guarantee some of [the company's] business deals with suppliers and others," and (3) the company "suffered a diminished reputation." *Id.* ¶ 41. Applying the principles outlined above, the Utah Supreme Court rejected these arguments and affirmed the district court's ruling, explaining that each asserted injury was either directly suffered by the company or derivative of that injury. *Id.* The court also emphasized that the owners had not shown that the insurer owed them any "special dut[ies]." *Id.* The fact that the owners bore the practical effect of the losses was irrelevant. *Id.* ¶ 40.

¶29　Turning to the instant case, the plaintiff owners testified that the City's actions caused significant discord in the Butcher family. Lisa and Cory blamed Bill for the problems with the City, and Bill blamed Lisa. To the extent the family would try to get together for the holidays, it was "like oil and water" and "just didn't work." Moreover, the stress of the incident similarly led to strife in Bill and Penny's marriage. And Barbara was upset that her children were fighting; she wanted everyone "to get along" and be "normal." The district court concluded that these injuries were enough to give standing to the plaintiff owners to recover emotional distress damages.

¶30　The court's ruling was erroneous. For one thing, the plaintiffs have identified no contractual or tort duties that would have run to the plaintiff owners on the facts of this case.[11] *See Stocks*, 2000 UT App 139, ¶ 11 (explaining that the "narrow

---

11. The plaintiffs may have become cognizant of this issue in the proceedings below when, on the eve of trial, they moved to amend their complaint to allege that the plaintiff owners were third-party beneficiaries of a contract between the plaintiff companies and the City. The court denied the motion, holding that it would be "unfairly prejudicial to the City" to allow the plaintiffs to amend the complaint so late in the proceedings. On appeal, the plaintiffs do not challenge the court's denial of the motion to amend.

exception" to the bar against individual shareholder suits applies when "the wrong itself is a violation of a duty arising from a contract or otherwise, and owed directly to the shareholder" (cleaned up)); *cf. Pepe v. General Motors Acceptance Corp.*, 604 A.2d 194, 196 (N.J. Super. Ct. App. Div. 1992) (rejecting car dealership owner plaintiffs' argument that "their role as guarantors of the debt of the dealerships establishe[d] a 'special relationship' creating duties owing directly to them"). They similarly fail to identify any authority for the proposition that either the Equal Protection Clause or the Due Process Clause, standing alone, creates any duties that a government owes to the shareholders of a corporation when the corporation and the government are the parties actually dealing with each other.[12]

¶31 Additionally, the plaintiff owners' asserted injuries were based entirely upon the destruction or degradation of the plaintiff companies. The testimony of the plaintiff owners makes clear that they would not have suffered the injuries but for the City's actions taken against the corporate entities. Although the emotional distress alleged in *Stone Flood* centered on pecuniary harms suffered by the plaintiff owners that flowed from the claimed degradation of their company, *see* 2011 UT 83, ¶ 41, the plaintiff owners' injuries here are no less derivative than those alleged by the owners in *Stone Flood*. Pushing back, the plaintiffs argue that "[w]here, as here, government officials' actions violate *both* the constitutional rights of corporations and the constitutional rights

---

12. The closest they get to citing any authority on this point is their invocation of *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), for the proposition that "both individuals and corporations have constitutional rights." *Citizens United* addressed the constitutionality of a federal statute barring "corporations and unions from using their general treasury funds to make independent expenditures for speech defined as an electioneering communication or for speech expressly advocating the election or defeat of a candidate." 558 U.S. at 318–19 (cleaned up). The case did not address any duties that the government owes to the shareholders of a corporation with which it deals.

of the individual owners, both parties have claims and both parties have standing." A Tenth Circuit case demonstrates why they are mistaken.

¶32    In *Guides, Ltd. v. Yarmouth Group Property Management, Inc.*, the plaintiffs—a corporation and its sole shareholder, who was Black—sued the corporation's landlord under 42 U.S.C. § 1981, alleging that the landlord declined to renew the lease based on the shareholder's race. 295 F.3d 1065, 1069, 1074 (10th Cir. 2002). At the conclusion of trial, the jury awarded $1.7 million to the plaintiff shareholder and $1.15 million to the plaintiff corporation. *Id.* at 1071. After trial, the district court vacated the award to the shareholder, ruling that her claims were derivative. *Id.* On appeal, the Tenth Circuit affirmed, explaining that the shareholder's "distress arose from the failure of the [landlord] to contract with or lease to [the corporation] and was a product of the economic damages which were suffered by the corporation." *Id.* at 1072. In other words, the shareholder "suffered no violation of her contract rights or right to lease that was in any way different from the violations claimed by [the corporation]." *Id.*

¶33    The majority in *Guides* did not specify the type of emotional distress that the shareholder suffered. However, the dissent all but stated that her damages were based on emotional distress that had little to do with the financial degradation of the corporation. *See id.* at 1082 (Jenkins, J., concurring in part and dissenting in part) (criticizing the majority's "dismiss[al]" of the shareholder's "harm as merely 'a product of the economic damages which were suffered by the corporation'" when the "uncontroverted testimony" showed that the shareholder "became deeply disturbed" before the corporation "had suffered any actual economic loss"). In other words, the shareholder plaintiff appeared to suffer damage independent of the degradation of the corporation, yet she still lacked standing to recover damages based on the emotional distress the jury found she suffered. *See id.* In light of the explanation offered in the dissent, then, the import of *Guides* is quite clear: any emotional distress that the plaintiff shareholder suffered as a result of the landlord's apparent racism

in refusing to contract with the corporation was derivative of the damages the plaintiff corporation suffered, regardless of when the shareholder's emotional distress arose.

¶34 *Guides* is directly on point here.[13] The plaintiff companies—and not the plaintiff owners—applied for, were added to, and

---

13. At oral argument, counsel for the plaintiffs attempted to distinguish *Guides* on the ground that the Tenth Circuit applied 42 U.S.C. §§ 1981 and 1982, which guarantee "the right of all persons to 'make and enforce' contracts" and the right of all American citizens "to 'inherit, purchase, lease, sell, hold, and convey real and personal property,'" respectively. *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002) (quoting 42 U.S.C. §§ 1981(a), 1982). Beyond a general suggestion that the corporate form does not bar a shareholder plaintiff from asserting a claim based on an asserted *constitutional* violation visited upon the corporation, counsel offered no rationale for limiting *Guides* to claims asserted under sections 1981 and 1982 (as opposed to claims asserted under section 1983), nor did she cite any authority for doing so. And she likely could not have done so. Although the plaintiffs' claims were based on the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the vehicle for asserting a claim under eitherprovision comes from *statute*. *See, e.g.*, *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (explaining that "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts" and are instead "generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose," such as section 1983). Additionally, counsel's argument overlooks that sections 1981 and 1982 were enacted in the wake of the Civil War to enforce the rights enshrined in the Reconstruction Amendments. *See, e.g.*, *Neal v. Delaware*, 103 U.S. 370, 386 (1880) (explaining that precursor to section 1981 was "constitutional

(continued…)

were subsequently removed from the City's tow rotation. Therefore, any asserted constitutional violations in this case were suffered by the plaintiff companies, not by the plaintiff owners, and the concomitant right to sue belonged to the companies. Any injuries to the plaintiff owners were entirely derivative of the harm done to the plaintiff companies. Were we to adopt the plaintiffs' reasoning to the contrary, shareholders—assuming they suffered emotional distress based on the corporation's financial loss—would always have standing to recover because "corporations cannot suffer emotional distress." *Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 16, 424 P.3d 1154. Stated otherwise, the "exception would swallow the rule against shareholder standing." *Stone Flood*, 2011 UT 83, ¶ 36 (cleaned up).

¶35 In short, the plaintiffs ignore that if any person or entity possessed a property interest in staying on the rotation, it was the plaintiff companies. The Property was owned by Mountain West, and the plaintiff companies were on the City's tow rotation. The plaintiff owners merely acted on behalf of the plaintiff companies. *See generally, e.g., Stamper v. Johnson*, 2010 UT 26, ¶ 19, 232 P.3d 514 (noting elements necessary to establish agency relationship). Moreover, the plaintiffs overlook the legal effect of using the corporate form to limit liability—that a corporation's legal rights

---

exertion[] of the power to pass appropriate legislation for the enforcement of the provisions of the Fourteenth Amendment"); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968) ("[Section] 1982 bars all racial discrimination, private as well as public, in the sale or rental of property, and . . . the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment."). We therefore see no principled basis for treating claims brought under sections 1981 and 1982 differently from those brought under section 1983 in the context of a suit in which a corporation and its shareholders both assert violations of their constitutional rights.

belong to the corporation, not its shareholders.[14] Were it otherwise, the corporate form would be both "shield and sword." *See Alford v. Frontier Enters., Inc.*, 599 F.2d 483, 484 (1st Cir. 1979). That simply is not the law. The choice to organize a business as a corporate entity has many benefits and protections. But those benefits and protections come at a real-world cost in a case such as this.

¶36     For these reasons, we conclude that the court erroneously determined that the plaintiff owners had standing to recover emotional distress damages based on the alleged harm done to the plaintiff companies. It necessarily follows that the award of emotional distress damages to the plaintiff owners must be vacated.

B.      Section 1983 Claims

¶37     Next, the City asserts that the district court should have dismissed the plaintiffs' procedural due process and equal protection claims, which the plaintiffs brought under section 1983. Before trial, the court determined that the plaintiffs had a property interest in remaining on the tow rotation under Directive 45. The court also denied the City's motion for summary judgment on the plaintiffs' equal protection claim, concluding that there were genuine issues of material fact about whether the plaintiffs had been treated differently from comparator companies who were

---

14. It also bears mention that none of the plaintiff owners asserted a separate claim for intentional infliction of emotional distress—or any claims of their own, for that matter—in the operative amended complaint. The claims they did assert were identical to those asserted by the plaintiff companies and in fact were asserted collectively with the corporate entities. While this "does not entirely cinch matters," it does suggest a "conflation" of the plaintiff owners' injuries with those suffered by the plaintiff companies, which weighs against a determination of standing. *See Stone Flood & Fire Restoration, Inc. v. Safeco Ins. Co. of Am.*, 2011 UT 83, ¶ 41 n.7, 268 P.3d 170 (cleaned up).

similarly situated. For these reasons, the court allowed the jury to decide the plaintiffs' procedural due process and equal protection claims. The City argues that the court should have dismissed both claims as a matter of law because (1) the plaintiffs lacked a property interest in remaining on the City's tow rotation and (2) the Property's location in a watershed overlay protection zone and near a drinking water well required that the comparator in the equal protection analysis be located in a similar area. We agree with the City on both counts.

1.      Procedural Due Process

¶38    Courts analyze a procedural due process claim using "a two-part test." *Northern Monticello All., LLC v. San Juan County*, 2022 UT 10, ¶ 31, 506 P.3d 593. First, a court asks "whether the complaining party has been deprived of a protected interest in property or liberty." *Id.* (cleaned up). If it finds a "deprivation of a protected interest," the court must then "consider whether the procedures at issue comply with due process." *Id.* (cleaned up). Prior to trial, the district court relied on the right to appeal outlined in Directive 45 to rule that the plaintiffs had a property interest in remaining on the City's tow rotation once they were added to it. The City asserts that the plaintiff companies lacked a property interest as a matter of law and that the court should therefore have dismissed the plaintiffs' procedural due process claims. We agree with the City.

¶39    In *Northern Monticello*, our supreme court defined a property interest under the Fourteenth Amendment as a "legitimate claim[] of entitlement to some benefit." 2022 UT 10, ¶ 32 (cleaned up).[15] Such an interest can be created "only where

---

15. The City fails to cite *Northern Monticello* in either of its briefs. However, it relies on many of the cases that the *Northern Monticello* court cited. And because we have a duty to "get the law right," *McDonald v. Fidelity & Deposit Co. of Md.*, 2020 UT 11, ¶ 33, 462 P.3d 343, the City's failure to specifically cite the case doesn't prevent us from applying it here.

existing rules and understandings that stem from an independent source such as state law secure certain benefits and support claims of entitlement to those benefits." *Id.* (cleaned up). Accordingly, "an entitlement to a benefit arises only when the discretion of the issuing agency is so narrowly circumscribed as to virtually assure conferral of the benefit." *Id.* ¶ 34 (cleaned up). The most common way that a state creates a property interest is when it "enact[s] a statutory scheme that sets significant and substantive limits on official discretion, such that the benefit in question becomes an entitlement and not a unilateral expectation." *Id.* ¶ 33. For example, where a state goes "beyond simple procedural guidelines and instead use[s] language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, there [is] no escaping the conclusion that the state has created a protected liberty interest." *Id.* (cleaned up).

¶40   The court was equally clear in explaining what a property interest is *not* in the context of a "land use regulation case." *Id.* ¶ 34. "Where a local regulator has discretion with regard to the benefit at issue, there normally is no entitlement to that benefit." *Id.* (cleaned up). Therefore, a property interest cannot arise from "an abstract need for, or unilateral expectation of, a benefit." *Id.* ¶ 32 (cleaned up). Nor can a "benefit" be "a protected entitlement if government officials may grant or deny it in their discretion." *Id.* ¶ 34 (cleaned up).

¶41   The *Northern Monticello* court addressed "a curiously complex set of appeals," in which an LLC with property adjacent to a wind farm complained to the county that the owners of the wind farm had not complied with the conditions of the applicable CUP. *Id.* ¶¶ 1, 3–4. The LLC argued that it had a right to participate in the county's hearing in which the county considered whether to revoke the wind farm's CUP. *Id.* ¶ 1. After a series of rulings, both from the county and from the courts, the case worked its way to the supreme court, which held that the LLC did not possess a property interest in having the CUP enforced or a right to participate in the revocation hearing. *Id.* ¶¶ 1–2, 30–41.

¶42 Specifically, the court held that the county ordinance created little more than a unilateral expectation of a continued benefit because it gave the county "broad discretion" in how it enforced a CUP. *Id.* ¶ 35. Under the plain language of the ordinance, the county was under no obligation to "revoke or, alternatively, enforce a permit at any time." *Id.* The court likewise rejected the argument that a right to appeal found in the County Land Use, Development, and Management Act created a property interest, explaining that a mere procedural right, standing alone, cannot create a property interest. *Id.* ¶¶ 37–38. Finally, the court acknowledged that "the addition of mitigating conditions on a CUP, specifically intended to protect certain property owners, may in some cases provide landowners with something more than just a unilateral expectation of a benefit." *Id.* ¶ 40 (cleaned up). But the court returned to the discretionary nature of the applicable laws and explained that it "simply" was not convinced that the LLC's "expectation of enforcement of the CUP and participation in the revocation hearing" created anything more than a "unilateral expectation" of a benefit. *Id.* (cleaned up).

¶43 Applying *Northern Monticello* here, we conclude that the court erred in holding that Directive 45 gave the plaintiffs a property interest in remaining on the tow rotation. When they agreed to the conditions in the Application, the plaintiff companies specifically agreed that "inclusion on the towing rotation is voluntary and a discretionary privilege extended by the West Jordan Chief of Police . . . and is not a legal right." The Application's clear language alone was likely enough to doom the plaintiffs' argument. *Cf. State v. Tryba*, 2000 UT App 230, ¶ 13, 8 P.3d 274 (noting in the statutory interpretation context that where the "language is plain and unambiguous, we do not look beyond the language's plain meaning to divine legislative intent" (cleaned up)); *Triple J Parking Inc. v. SCSB LLC*, 2018 UT App 162, ¶ 14 n.4, 436 P.3d 185 (explaining that when the "plain language within the four corners" of a written contract is unambiguous, a court "interpret[s] the contract as a matter of law" (cleaned up)). However, even in the absence of this clear statement, Directive 45 could not have conferred the asserted property interest upon the

plaintiff companies in this case because of the discretionary nature of that policy.

¶44 The plaintiffs correctly note that policies that "substantively limit official discretion create a legitimate claim of entitlement and thus, a property right."[16] *See, e.g.*, *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) ("A state creates a protected liberty interest by placing substantive limitations on official discretion." (cleaned up)); *see also Brown v. Eppler*, 725 F.3d 1221, 1227 (10th Cir. 2013) (citing *Thompson* and collecting cases stating the same proposition). The plaintiffs' problem, however, is that Directive 45 did not actually limit the City's discretion. Although it established a "suspension scale" that provided for anything from a "10-day warning notice" to a "3-month suspension or permanent removal from the rotation" based on the severity of the violation or infraction, it did not *require* the City to take any action at all. It merely provided that "[a] tow company, whose business, yard, trucks, or employees are not in compliance with the requirements set forth [therein], *may be* suspended and/or removed from the [City's] approved list of tow service providers." In other words, a violation of Directive 45 *may* have resulted in sanction, but it did not necessitate it. This is much like the discretionary scheme at issue in *Northern Monticello* and weighs against a determination that Directive 45 bestowed a property interest on the plaintiff companies. *See* 2022 UT 10, ¶ 35

---

16. Before addressing the merits, the plaintiffs argue, again, that the City has not carried its burden on appeal to marshal the evidence in favor of the court's factual findings on this point. As the plaintiffs acknowledge, however, "the district court found that, *as a matter of law*, once a tow company was accepted on to the tow rotation, it had a property interest in remaining on the rotation such that the City owed it due process prior to removing it." (Emphasis added.) In other words, the City challenges the court's *legal* conclusion that the plaintiffs had a property interest, not any of its underlying factual findings. Therefore, the City was not required to marshal the evidence on this issue. *See Schmith v. Schmit*, 2025 UT App 124, ¶ 9 n.1, 577 P.3d 365.

(explaining that the local ordinance did not require the planning commission to "revoke or, alternatively, enforce a permit at any time").

¶45 Additionally, Directive 45 contained no language specifying the criteria for companies to remain on the tow rotation. *See id.* ¶ 33 (explaining that a law's use of unmistakably mandatory "language . . . requiring that certain procedures 'shall,' 'will,' or 'must' be employed" leads to the inescapable "conclusion that the state has created a protected liberty interest" (cleaned up)); *see also Chavers v. Morrow*, 354 F. App'x 938, 941 (5th Cir. 2009) (per curiam) (declining to find a property interest in a similar case when there was no mandatory language—statutory or otherwise—"specifying which tow companies [were] eligible to be, *or remain*, on the list" (emphasis added)). This also weighs against a determination that the policy created a property interest.

¶46 Finally, the fact that Directive 45 created a right to appeal does not support a conclusion that the plaintiff companies had a property interest in remaining on the tow rotation. As the *Northern Monticello* court explained, a procedural right does not, standing alone, create a constitutionally protected property interest. 2022 UT 10, ¶ 36.

¶47 In sum, Directive 45 cannot carry the weight that the district court placed on it because (1) the Application plainly stated that the plaintiff companies had no legal right when they were added to the tow rotation, (2) Directive 45 did not actually limit the City's discretion in how it enforced the policy, and (3) a mere procedural right, standing alone, cannot create a property interest. Therefore, the plaintiff companies possessed little more than a "unilateral expectation" of remaining on the tow rotation. *See id.* ¶ 34 (cleaned up). This being the case, the plaintiffs were not deprived of a property interest for purposes of the Due Process Clause and, accordingly, the district court should have dismissed their procedural due process claims as a matter of law.

2.      Equal Protection

¶48    "Equal protection of the law requires that similarly situated persons be treated alike." *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, ¶ 23, 545 P.3d 781 (cleaned up). At trial, Lisa and Mountain West prevailed on their equal protection claim under a "class-of-one" theory. Establishing such a claim requires a plaintiff to show (1) that "she has been intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[17] Here, the district court left it to the jury to determine (1) whether the plaintiffs were similarly situated to others on the City's tow rotation and (2) whether the City's stated reason for its actions—the Property's location in a watershed overlay protection zone and close proximity to a drinking water well—was mere pretext for its actions. The City argues that the court should have resolved the similarly situated issue against the plaintiffs and dismissed the claim. We agree with the City.[18]

---

17. When a plaintiff asserting an equal protection claim on a class-of-one theory cannot show that it was treated differently from another who was similarly situated, a court need not address the rational basis issue. *See, e.g.*, *Moulding Invs., LLC v. Box Elder County*, 2024 UT App 23, ¶ 26, 545 P.3d 781 (resolving plaintiff's equal protection claim on the similarly situated inquiry at the motion to dismiss stage); *see also, e.g.*, *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022) (not reaching rational basis issue when the plaintiff could not establish that it was similarly situated to other comparators).

18. The plaintiffs make several procedural arguments in an attempt to avoid the merits, none of which are persuasive. First, they claim that the "comparator evidence required a 'fact-bound inquiry' and the City never argued otherwise, so the issue was properly submitted to the jury." In fact, after the plaintiffs rested

(continued…)

¶49     A plaintiff asserting an equal protection claim in the land-use context must "identify comparators that are similarly situated in *all* material respects," a tall task because property, by its very nature, is "unique." *Moulding Invs., LLC*, 2024 UT App 23, ¶ 27 (cleaned up). The City argues that because the plaintiff companies were the only members of the tow rotation located in a watershed overlay protection zone and near a drinking water well, the court should have determined that no equal protection comparators existed as a matter of law and dismissed the claim as a result. We agree.

¶50     The procedural posture of this case appears to be unique in that we are aware of no other Utah appellate case in which a class-of-one equal protection claim in the land use context has gone to trial and been resolved by a jury in favor of the plaintiff.

---

their case, the City moved for a directed verdict, arguing—as a matter of law—that the plaintiffs had not established that the plaintiff companies were similarly situated to other comparable companies. Similarly, in a post-trial motion, the City argued—again, as a matter of law—that the plaintiffs could not show that any comparator companies were "similarly situated *in every material respect*" to the plaintiff companies. Second, the plaintiffs state in a footnote, without any accompanying analysis, that the City did not argue below "that the comparator analysis requires a 'high bar' in the 'land-use context,' as it now claims," and that the issue is therefore unpreserved. Our caselaw does not require a litigant to cite a specific case or language to preserve an issue. What is required is that the issue be "specifically raised such that [it] is sufficiently raised to a level of consciousness before the [district] court so as to give the [district] court an opportunity to address the claimed error, and if appropriate, correct it." *State v. Noor*, 2012 UT App 187, ¶ 5, 283 P.3d 543 (cleaned up). The City did that in the proceedings below. Finally, the plaintiffs suggest—again—that the City failed to marshal the evidence on appeal. For reasons we explain, *see infra* ¶¶ 50–51, the determination in this case was a legal question, so the City did not need to marshal on appeal. *See Schmith*, 2025 UT App 124, ¶ 9 n.1.

Recognizing this dearth of authority, both sides point to nonbinding cases they argue resolve the matter. The City cites a number of cases in which an appellate court affirmed a grant of summary judgment in favor of the government on the similarly situated comparator issue and claims that these cases stand for the broad proposition that the issue is *always* a matter of law for the court to decide. However, an appellate court's affirmance of a grant of summary judgment doesn't mean that summary judgment in the same context on a different set of facts is always appropriate. *See, e.g.*, *Brandon v. Board of Educ.*, No. 22-CV-00635, 2025 WL 1360684, at *26 (E.D. Mo. May 8, 2025) (explaining that the Eighth Circuit's cases affirming summary judgment on the similarly situated issue do not bar the question from *ever* going to the jury).

¶51 The plaintiffs accurately cite a First Circuit case addressing a class-of-one claim for the proposition that "the ultimate determination as to whether parties are similarly situated is a fact-bound inquiry and, as such, is normally grist for the jury's mill." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007). However, in that same case, the First Circuit noted that not "every case, regardless of the proof presented, is a jury case," including the one that was before it. *Id.* There is some superficial factual support for the court's decision in the proceedings below that this issue was for the jury to decide. For example, the plaintiffs presented evidence that the City did not sanction another tow company on the rotation that apparently failed to comply with the applicable CUP requiring that its lot be paved to "protect the water table" from "leaking oil and gasoline." The problem is that there is no dispute on appeal that the plaintiff companies were the only companies on the tow rotation that operated in a watershed overlay protection zone and in close proximity to a drinking water well. This is fatal for the plaintiffs' argument because establishing an equal protection claim in this context requires "evidence sufficient to establish factual as well as regulatory similarity" in order "to show that other parties were similarly situated to them." *Id.* at 252; *see also Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 144 (1st Cir. 2016) (making clear

that a land use's potential environmental effect is material in a similarly situated inquiry).

¶52    On this point, we think the Eleventh Circuit's decision in *Strickland v. Alderman*, 74 F.3d 260 (11th Cir. 1996), is insightful. There, the plaintiff owned property that had standing water issues. *Id.* at 262. The city warned it would cite him under its standing water ordinance unless he fixed the problem. *Id.* When he failed to do so, the city cited him. *Id.* The plaintiff then sued the city, asserting, as relevant here, an equal protection claim under section 1983 and alleging that other properties with standing water issues had not been cited under the ordinance. *Id.* at 263. The case went to trial, and a jury found in the plaintiff's favor on the equal protection claim. *Id.* On appeal, the Eleventh Circuit reversed, explaining that the standing water on the plaintiff's property would persist for "months," while the water on the other owners' properties tended to "dissipate in a matter of days." *Id.* at 264–65. Consequently, the court determined that the disparate treatment was permissible because none of the other similarly situated landowners violated the ordinance as "egregiously" as the plaintiff had. *Id.* at 265. For this reason, the Eleventh Circuit held that the district court should have dismissed the claim as a matter of law. *Id.*

¶53    *Strickland* stands for the proposition that an equal protection plaintiff must establish more than mere superficial similarity. It was not enough in the proceedings below for the plaintiffs to put on evidence that another company on the tow rotation had a CUP requiring that its lot be paved to protect the water table and failed to comply with that condition. There was no indication that the other company operated near a source of West Jordan's *drinking* water. And, as the district court recognized, "it was not unreasonable for [the] City . . . to take enforcement action to protect public safety, namely the safety of drinking water." On these facts, the district court should have

ruled as a matter of law that the plaintiff companies lacked a similarly situated comparator.[19]

¶54    For these reasons, the plaintiff companies were not similarly situated to any of the other companies on the City's tow rotation. Consequently, the court should have dismissed the plaintiffs' equal protection claims.[20]

## II. The Plaintiffs' Cross-appeal

### A.    Zoning Estoppel

¶55    After trial, the district court denied the plaintiffs' zoning estoppel claim based on its conclusion that Mountain West did not comply with the land disturbance permit requiring it to repave the lot with asphalt. The plaintiffs argue that the court's ruling was erroneous because they offered evidence that (1) Lisa purchased the proper materials, (2) the recycled asphalt that had been placed was "twice as deep as required," and (3) the City initially approved Mountain West's permit in 2013. The plaintiffs also assert that the court erred because it didn't credit counsel's

---

19. This conclusion is buttressed by our caselaw that acknowledges the difficulty of merely *pleading* a class-of-one equal protection claim in the land use context, let alone *prevailing* on one. *See, e.g.*, *Moulding Invs., LLC*, 2024 UT App 23, ¶ 24 (requiring a plaintiff pleading a land use equal protection claim to "identify comparators that are similarly situated in all material respects"); *Farley v. Utah County*, 2019 UT App 45, ¶ 31, 440 P.3d 856 (same).

20. The City also argues that the district court erred in awarding the plaintiffs most of their requested attorney fees under 42 U.S.C. § 1988. Because the plaintiffs were not entitled to *any* of the relief they sought, we agree and vacate the fee award. *See, e.g.*, *Farrar v. Hobby*, 506 U.S. 103, 111 (1992) ("[T]o qualify as a prevailing party [under section 1988], a civil rights plaintiff must obtain at least *some* relief on the merits of his claim." (emphasis added)).

argument that the contractor "presumably" repaved the lot with the materials Lisa purchased. We are not persuaded.

¶56    Zoning estoppel applies when (1) a governmental entity (2) "exercis[es] its zoning powers" (3) "to prohibit a proposed land use" (4) "when a property owner," (5) "relying reasonably and in good faith on some governmental act or omission," (6) "has made a substantial change in position or incurred such extensive obligations or expenses" (7) "that it would be highly inequitable to deprive the owner of his right to complete his proposed development." *Checketts v. Providence City*, 2018 UT App 48, ¶ 21, 420 P.3d 71 (cleaned up). And the doctrine does not apply unless (8) "the action upon which the [property owner] claims reliance [is] of a clear, definite[,] and affirmative nature" and (9) "exceptional circumstances" are present, like the "intentional discriminatory application" of the relevant ordinance. *Id.* (cleaned up).

¶57    The district court found that Mountain West, as the Property's owner, did not pave the Property's lot in accordance with the land disturbance permit and the related permit drawings. Specifically, the court found that Mountain West failed to "install, or have installed, six inches of road base prior to installing 3 inches of recycled asphalt" and did not "apply any asphalt sealer or binding agent over the recycled asphalt." These two findings doomed the plaintiffs' zoning estoppel claim because they demonstrated the plaintiffs' "fail[ure] to comply with the conditions in the very permits they claimed to have relied upon."

¶58    We read the district court's ruling to mean that the plaintiffs failed to demonstrate reasonable reliance on the City's action because Mountain West had not complied with the terms of the land disturbance permit and permit drawings. The plaintiffs assert that the court's findings were flawed because they presented evidence that "the recycled asphalt on the [P]roperty [was] twice as deep as required" and that "Lisa purchased the correct materials . . . in 2013 to surface the lot,"

which her contractor "presumably" used. Similarly, the plaintiffs take issue with the finding that they did not "apply any asphalt sealer or binding agent over the recycled asphalt." On this point, they cite oral argument from the proceedings below where their counsel refuted the City's "claim that there . . . was no sealant on the [P]roperty" and where the City allegedly "conceded this point."

¶59    The plaintiffs have not shown that the court's findings were clearly erroneous. When a party has an affirmative burden to establish an element of a claim—as the plaintiffs did on their zoning estoppel claim, *cf. R.O.A. Gen. Inc. v. Salt Lake City Corp.*, 2022 UT App 141, ¶ 30, 525 P.3d 100 (noting that a party asserting equitable or judicial estoppel bears the burden of proof to establish those defenses)—it is not enough for the party to point to a place in the record where the court *could* have made the requested finding, *see, e.g.*, *Phillips Mfg. Co. v. Putnam*, 504 P.2d 1376, 1378 (Utah 1973) ("[I]f there is a reasonable basis in the evidence or from the lack of evidence, from which the court acting fairly and reasonably thereon could remain unconvinced, [its] refusal to so find must be sustained."). But, in asserting that Lisa's contractor "presumably" laid the proper materials, including the road base, this is exactly what the plaintiffs have done. Moreover, the plaintiffs point to no evidence that the Property's surface actually had "road base," "asphalt sealer," or a "binding agent." With respect to the asphalt sealer and binding agent, it is wholly insufficient for the plaintiffs to cite counsel's argument in the record showing that the City had not affirmatively disproved that there was no sealant on the surface, which is what the plaintiffs have done here. This was not evidence. *See, e.g.*, *State ex rel. Div. of Forestry, Fire & State Lands v. Six Mile Ranch Co.*, 2006 UT App 104, ¶ 31 n.10, 132 P.3d 687 ("[A]rgument of counsel is not evidence."); *Brown v. City of Fruit Heights*, 2023 UT App 39, ¶ 31 n.7, 529 P.3d 361 (same).

¶60    In sum, there was ample support for the district court's conclusion that the plaintiffs did not reasonably rely on the City's alleged actions in this case because there was evidence that

Mountain West failed to comply with the land disturbance permit and permit drawings when it repaved the Property. Consequently, the plaintiffs have not shown that the findings underlying the court's legal conclusion were clearly erroneous, and they are not entitled to reversal of the court's denial of their zoning claim.

B.      Substantive Due Process Claims

¶61     The district court initially determined that the plaintiffs had established a prima facie substantive due process claim and denied the City's motion for a directed verdict on the issue. The court subsequently reversed itself and dismissed the claim as a matter of law. The plaintiffs argue that the district court should have allowed their substantive due process claims to go to the jury. We disagree.

¶62     The "standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of the reviewing *judge*." *Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 64, 243 P.3d 1221 (emphasis added) (cleaned up). In other words, the issue is a question of law for the court to decide. *See, e.g., Mason v. Stock*, 955 F. Supp. 1293, 1308 (D. Kan. 1997) ("[T]he 'shock the conscience' determination is not a jury question."). To prevail on a substantive due process claim, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Peak Alarm Co.*, 2010 UT 22, ¶ 64 (cleaned up); *see also Smith ex rel. Smith v. Half Hollow Hills Central School Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (per curiam) ("The protections of substantive due process are available only against egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." (cleaned up)).

¶63     The First Circuit has explained that a reviewing court should look at a "continuum of government conduct, the

bookends of which present the easier cases." *Maldonado-González v. Puerto Rico Aqueduct & Sewer Auth.*, 158 F.4th 27, 35 (1st Cir. 2025) (cleaned up). "On one end of the continuum is negligent conduct, which is categorically beneath the threshold of constitutional due process." *Id.* (cleaned up). On the other end "is the sort of official action most likely to rise to the conscience-shocking level," namely, "conduct intended to injure in some way unjustifiable by any government interest." *Id.* (cleaned up). In the middle of the continuum lies "government conduct that is more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.* These are the cases that represent the "closer calls." *Id.* (cleaned up).

¶64    We are aware of no case in which a Utah appellate court has sustained a plaintiff's substantive due process claim on the basis that the challenged conduct shocked the conscience, and the plaintiffs cite none.[21] This is unsurprising, given that courts will find that a government actor's conduct shocks the conscience only in extreme cases. *See, e.g.*, *Rochin v. California*, 342 U.S. 165, 166–67 (1952) (concluding that conduct shocked the conscience when officers had received a tip that the petitioner "was selling narcotics," entered the petitioner's home without a warrant, forced his bedroom door open, "jumped upon" him when he placed two capsules in his mouth, tried to "extract the capsules," handcuffed and transported him to the hospital when those efforts failed, and "direct[ed]" a doctor to "pump" his stomach to induce vomiting); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that law enforcement's "deliberate

---

21. Of course, plaintiffs have prevailed on substantive due process *challenges* in Utah courts. *See, e.g.*, *In re adoption of K.T.B.*, 2020 UT 51, ¶ 31, 472 P.3d 843 (birth mother prevailed on an as-applied substantive due process challenge to a statute that allowed the district court to terminate her parental rights when she failed to "fully and strictly comply" with statute). But that is a different question from whether a government actor's conduct shocks the conscience as required for a plaintiff to prevail on a substantive due process *claim*.

indifference" to a pretrial detainee's "serious medical needs" shocked the conscience); *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 249, 252 (2d Cir. 2001) (affirming denial of a motion to dismiss a substantive due process claim when the complaint alleged that the defendant gym teacher grabbed the plaintiff student by the throat, shouted "I'll kick the shit out of you," lifted him off the ground by his neck, dragged him across the gym floor, choked him, rammed his forehead against a fuse box, and punched him in his face).

¶65  Perhaps the difficulty of establishing a substantive due process violation in this context becomes even clearer when considering the cases in which a plaintiff *hasn't* prevailed on such a claim. In scenarios "where government officials must act in haste," *see Maldonado-González*, 158 F.4th at 36 (cleaned up), a plaintiff can prevail only upon a showing that the government actor intended to cause harm, *see, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998) (holding that a third party's death resulting from a police officer's initiation of a high-speed chase did not shock the conscience in the absence of an "intent to harm suspects physically or to worsen their legal plight"). In one case, the Supreme Court even held—albeit over the objection of four dissenting justices—that it didn't shock the conscience when a prison inmate was shot in the leg by a guard and sustained severe injuries during a prison riot when the "security manager" had ordered guards to "shoot low" to quell the riot. *Whitley v. Albers*, 475 U.S. 312, 315–17, 327 (1986). And even where the benefit of hindsight isn't at issue, *cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) (noting in the Fourth Amendment context that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"), a lack of malintent clearly weighs strongly against a finding that conduct shocks the conscience, *see, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 117–18 (1992) (not conscience shocking when a city employee "died of asphyxia after entering a manhole to unstop a sewer line," even where the city allegedly followed "custom and policy of not training its employees about the dangers of working in

sewer lines and manholes, not providing safety equipment at jobsites, and not providing safety warnings" and where "a prior accident had given the city notice of the risks of entering the sewer lines"); *Slaughter v. Mayor of Baltimore*, 682 F.3d 317, 319 (4th Cir. 2012) (not conscience shocking when a firefighter recruit died during a dangerous training exercise when the fire department did not intend to "caus[e] harm to [the decedent] or any other recruit" (cleaned up)).

¶66   On appeal, the plaintiffs make a cursory argument that "there is little that is more conscience shocking than a police department pursuing a vendetta against its citizens" and therefore contend that the City violated their substantive due process rights. Based on the aforementioned principles, however, we readily conclude that the City's challenged conduct did not shock the conscience in this case. The plaintiffs have not shown conduct on the City's part that was so extreme that it would be akin to physically harming any of the plaintiffs or otherwise ignoring their serious medical needs. The one thing that the plaintiffs potentially have going for them is that there is no indication that the City officials had to act in haste. Indeed, "where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to shock the conscience." *Maldonado-González*, 158 F.4th at 36 (cleaned up). Setting aside whether the City's conduct was deliberately indifferent, it certainly was not "so brutal and offensive to human dignity as to shock the conscience." *Smith*, 298 F.3d at 173 (cleaned up). For this reason, the City's alleged conduct simply doesn't rise to the level of shocking the conscience, "at least not the conscience of these three . . . judges." *See Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Cir. 2001).

¶67 Because the City's conduct did not shock the conscience, the district court correctly dismissed the plaintiffs' substantive due process claim.[22]

CONCLUSION

¶68 The district court erroneously concluded that the plaintiff owners had standing to recover emotional distress damages based on harm allegedly done to the plaintiff companies. Moreover, the court should have dismissed the plaintiffs' procedural due process and equal protection claims. For these reasons, the court abused its discretion in awarding the plaintiffs their attorney fees. However, the court properly denied the plaintiffs' zoning estoppel and substantive due process claims. We therefore affirm in part, reverse in part, and remand the matter for entry of judgment consistent with this opinion.

––––––––––

22. The plaintiffs make several other arguments on appeal, namely that the district court erred in (1) excluding their economic damages, (2) excluding one of their witnesses, and (3) dismissing the section 1983 claims against Coordinator and Manager based on qualified immunity. Because the district court should have denied the plaintiffs' section 1983 claims as a matter of law and resolved the standing issue in the City's favor, the plaintiffs' remaining arguments are moot, and we do not address them.